**J.K. AND SUSIE L. WADLEY RESEARCH INSTITUTE AND BLOOD BANK, et al., Relators,**

v.

**Joseph B. MORRIS, Judge, 101st Judicial District Court of Dallas County, Texas, Respondent.**

No. 05–89–00056–CV.

Court of Appeals of Texas, Dallas.

Aug. 7, 1989.

R. Brent Cooper, Billie D. Ballengee, James Gregory Marks, Dallas, for relators.

Glenn Sodd, Ron Edmondson, Corsicana, for respondent.

Before HOWELL, LAGARDE and WHITTINGTON, JJ.

LAGARDE, Justice

Relators J.K. and Susie L. Wadley Research Institute and Blood Bank, The Wadley Institutes of Molecular Medicine, Wadley Central Blood Bank of Dallas, Goddard Computer Science Institute, and Norwood Hill, M.D. (collectively "Wadley"), seek a writ of mandamus against respondent the Honorable Joseph B. Morris, Judge, 101st Judicial District Court of Dallas County, Texas (the "101st Court"), to vacate an order denying Wadley's motion to disqualify the law firm of Dawson & Sodd from representing real parties in interest Reta J. Kuehn and Steven Kuehn.[1] Wadley contends that the 101st Court abused its discretion in failing to disqualify Dawson & Sodd, because, as a matter of law, Dawson & Sodd's continued representation of the Kuehns violates the Texas Code of Professional Responsibility.[2] For the reasons given below, we deny the writ of mandamus.

During the last decade, there were increasing incidents of patients suffering from acquired immunodeficiency syndrome (AIDS). Public consciousness of, and concern over, the disease mounted. Wadley provides blood for patients needing blood transfusions. Wadley recognized that AIDS could be transmitted if blood provided for a transfusion was contaminated with the AIDS virus. It also recognized its potential liability to patients that might contract AIDS from blood that it had supplied.

Accordingly, Wadley retained the law firm of Thompson & Knight to implement procedures that might minimize its exposure to liability. Dr. Norwood Hill, the physician who served as liaison between Wadley and Thompson & Knight, testified that "[c]ertainly consultation specifically relevant" to Wadley's concerns over AIDS-related liability arose "probably at least by 1983." He testified further that Wadley asked Thompson & Knight to provide legal advice in connection with carrying out a "look-back" program, a program to identify and notify previous blood donees who might have contracted the AIDS virus through a contaminated blood supply. The partner at Thompson & Knight primarily responsible for handling Wadley's concerns was Malia Litman, although other attorneys at Thompson & Knight were also involved. At one point an advisory council of various hospitals and blood banks, whose members included Wadley, discussed instituting a uniform "look-back" procedure. The conference, which took place in February 1986, was necessary because not all area hospitals and blood banks agreed on whether, or how, to implement a "look-back" procedure. Litman attended this conference as Wadley's attorney.

Meanwhile, Jerry D. Kuehn ("Jerry") required a blood transfusion in March 1985 and obtained the blood required from Wad-

---

1. Mary Lou Gordon is named as a plaintiff in Kuehn's response to Wadley's motion to disqualify; however, our record contains no petition in which she is named as a plaintiff seeking any affirmative relief. Gordon was the mother of Jerry D. Kuehn, Reta's deceased husband. For several years she worked as a secretary for Dawson & Sodd, so that the firm was the Kuehn family's logical choice to handle their litigation.

2. SUPREME COURT OF TEXAS, RULES GOVERNING THE STATE BAR OF TEXAS art. X, § 9 (Code of Professional Responsibility) (Vernon 1988) (hereinafter cited as Texas Code of Professional Responsibility).

ley. In the summer of 1986, Jerry was diagnosed as having AIDS. He alleged that he was infected by contaminated blood supplied by Wadley. He also alleged that, at the time of the transfusion, Wadley possessed the knowledge and technology to screen its blood supply for the AIDS virus, but had negligently failed to do so. In October 1986, Jerry gave notice of his claim to Wadley. Subsequently (exactly when is not clear from the record), Reta J. Kuehn, Jerry's wife, was also diagnosed as having AIDS. On April 25, 1988, the Kuehns filed suit against Wadley (along with other defendants not presently before this Court). The suit was docketed as cause no. 88–5156–E, styled *Jerry D. Kuehn, et al., v. J.K. and Susie L. Wadley Research Institute and Blood Bank, et al.*, pending before the 101st Court. Shortly after the suit was filed, Jerry died from his affliction. Reta J. Kuehn continues with the litigation both individually and as administrator of Jerry's estate.

In May 1983, Thompson & Knight hired an associate named Terry Jacobson. Litman and Jacobson were both in the litigation section of the firm. Their offices were not contiguous, but were only a few doors apart, and they shared a common secretarial pool. There was testimony concerning the involvement of specific attorneys at Thompson & Knight, besides Litman, in the Wadley matters, but no one could recall any specific instance when Jacobson ever became involved. Dr. Hill could not recall any contact that he had had with Jacobson during Jacobson's tenure at Thompson & Knight.

At the end of 1987, Jacobson left Thompson & Knight. In the spring of 1988, Jacobson joined the law firm of Dawson & Sodd. Glenn Sodd, a named partner, conceded during oral argument that Jacobson joined his firm about a week after it first filed suit on the Kuehns' behalf. At first Jacobson worked in the firm's Dallas office, but, after a few months, he transferred to the main office in Corsicana. On June 9, 1988, the Kuehns filed their first

amended original petition, still (so far as it appears from our record) the live pleading in the underlying litigation. Sodd actually signed the petition on behalf of the Kuehns, but Jacobson's name also appears below the signature line.

Discovery proceeded. Subsequently, Wadley realized that Jacobson, now prosecuting suit against it on the Kuehns' behalf, had been associated with Thompson & Knight during the time that Wadley consulted that law firm in connection with its concerns over AIDS-related liability. Wadley filed a motion to disqualify the law firm of Dawson & Sodd from representing the Kuehns any further. The 101st Court conducted a hearing, heard testimony, reviewed portions of Dr. Hill's deposition,[3] and entertained argument of counsel. On November 28, 1988, the 101st Court denied the motion without explanation. This proceeding followed.

### 1. *Mandamus as the appropriate remedy*

The Kuehns first argue that mandamus will not lie when a trial court denies, as opposed to grants, a motion to disqualify. They acknowledge that this Court has entertained original proceedings to review a trial court's granting such a motion, *e.g.*, *Petroleum Wholesale, Inc., v. Marshall,* 751 S.W.2d 295 (Tex.App.—Dallas 1988, orig. proceeding). They argue, however, that granting a motion to disqualify results in immediate harm: the trial court proceedings are disrupted while the client whose attorney has been disqualified obtains new counsel. Conversely, denying a motion to disqualify results in no such immediate disruption. Furthermore, the "severity of the remedy" of disqualification—depriving a party an attorney of his choice—always results in some harm to that party. *See NCNB Texas Nat'l Bank v. Coker,* 765 S.W.2d 398, 400 (Tex.1989). Conversely, denying a motion to disqualify does not result in that particular harm to that particular party.

3. The parties stipulated that portions, but not the entirety, of Dr. Hill's deposition would be

offered as evidence.

After this case was argued, this Court, in another disqualification case, conditionally granted a writ of mandamus against a trial court that had denied a motion to disqualify. *Hoggard v. Snodgrass,* 770 S.W.2d 577 (Tex.App.—Dallas, 1989, orig. proceeding) (not yet reported). Thus, this Court has held that mandamus will lie, under some circumstances at least, for this Court to review an order denying a motion to disqualify. *Hoggard,* 770 S.W.2d at 580–582. Nonetheless, we recognize the strength of the Kuehns' argument: if a trial court abuses its discretion by *granting* a motion to disqualify, immediate and palpable harm necessarily follows. If a trial court, on the other hand, abuses its discretion by *denying* a motion to disqualify, no immediate and palpable harm necessarily follows. In *Hoggard,* this Court concluded that an immediate and palpable harm followed from the trial court's denying a motion to disqualify in that case. *Hoggard,* 770 S.W.2d at 581–582. That harm was a clear and present violation of Canon 9 of the Texas Code of Professional Responsibility. *Hoggard,* 770 S.W.2d at 582.

■ We conclude, therefore, that mandamus will lie, in an appropriate case, to direct a trial court to vacate an order denying a motion to disqualify. Granting a motion to disqualify sets forth at least a prima facie case that harm has occurred. (We expressly do not speculate here whether, or how, such a prima facie case might be rebutted.) When a motion to disqualify is denied, however, no such prima facie case is established. Therefore, a relator seeking the vacation of an order denying a motion to disqualify has a heavier burden than a relator seeking the vacation of an order granting a motion to disqualify. The latter would generally enjoy a rebuttable presumption that harm has in fact occurred; the former would generally not.

■ This difference in burdens, however, does not mean that a relator seeking review of an order denying a motion to disqualify should never have the opportunity to do so, simply because the motion to disqualify has been denied. Such a relator cannot automatically be denied even an op-

portunity to show that, under the circumstances of his case, the trial court in fact abused its discretion by denying a motion to disqualify. We hold, therefore, that an action of mandamus will lie to give this Court an opportunity at least to review the 101st Court's order denying Wadley's motion to disqualify Dawson & Sodd. We reserve the question until later whether Wadley has shown such "an immediate and palpable harm," *Hoggard,* 770 S.W.2d at 581–582, as to justify a conditional granting of a writ of mandamus.

2. *The "substantial relationship" test*

■ The next question is whether Wadley showed a substantial relationship between the matters for which it sought legal advice from Thompson & Knight and the Kuehn litigation. *NCNB Texas Nat'l Bank,* 765 S.W.2d at 399–400. We note at the outset that this Court has not previously addressed the "substantial relationship" test. In *Petroleum Wholesale,* we directed that a firm be disqualified from a case because it had hired an associate from an adversarial firm and, while at the former firm, the associate had *actually participated* in confidential discussions concerning that very case. *Petroleum Wholesale,* 751 S.W.2d at 296. Much the same situation obtained in *Hoggard,* 770 S.W.2d at 582–583. In *Gilbert McClure Enterprises v. Burnett,* 735 S.W.2d 309 (Tex.App.—Dallas 1987, orig. proceeding), the only question was whether an attorney who might have been a material fact witness in the case should have been disqualified from representing a party to the case. *Gilbert McClure Enter.,* 735 S.W.2d at 311. No one claimed, however, that the attorney had ever obtained any confidences of the movant to disqualify by his former representation of the movant in any other legal matter. Thus, the "substantial relationship" test was irrelevant in *Gilbert McClure Enterprises.*

In this proceeding, there is no dispute that the Kuehns' suit against Wadley was filed after Jacobson had left the firm of Thompson & Knight. Thus, this proceeding does not present the situation in which an attorney moves from one firm to another *at a time when the very same litiga-*

*tion is pending between the two firms.* Instead, Wadley argues that its consultation with Thompson & Knight was to address its concerns over its exposure to AIDS-related liability generally. [1] It acknowledges that it could not have anticipated specifically the Kuehn litigation, at least up until the time that Jerry gave notice of his claim to Wadley. Nonetheless, it argues that its consultation with Thompson & Knight was to implement legal procedures and defenses generally against the kind of litigation that the Kuehn case exemplifies. It concludes, therefore, that the matters on which it sought Thompson & Knight's legal advice in the mid–1980's are "substantially related" to the issues involved in the Kuehn litigation.

The Supreme Court has recently addressed the standard for showing a substantial relationship:

> The moving party [here, Wadley] must prove the existence of a prior attorney-client relationship in which the factual matters involved were so related to the facts in the pending [Kuehn] litigation that it creates a genuine threat that confidences revealed to his former counsel [generally, Thompson & Knight, with whom Jacobson specifically had been associated] will be divulged to his present adversary [the Kuehns, through the law firm of Dawson & Sodd]. Sustaining this burden requires evidence of *specific similarities capable of being recited in the disqualification order. If this burden can be met, the moving party is entitled to a conclusive presumption that confidences and secrets were imparted to the former attorney.*

*NCNB Texas Nat'l Bank,* 765 S.W.2d at 400 (Tex.1989) (emphasis added). With this standard in mind, we turn to the specific similarities shown between Thompson & Knight's representation of Wadley and the Kuehn litigation.

A. Thompson & Knight's representation of Wadley

   i. *On concerns of AIDS-related liability*

Dr. Hill testified that, to the best of his knowledge, he was the only one at Wadley who had any communications with Thompson & Knight during the relevant time. Therefore, he was the only witness associated with Wadley who was capable of giving personal knowledge of actual matters on which Wadley consulted Thompson & Knight. During direct examination at the hearing on Wadley's motion to disqualify, Dr. Hill testified as follows:

Q. [Wadley's attorney:] When did you first consult with Thompson & Knight regarding issues pertinent to the AIDS crisis?

A. At least by 1984, but I believe some before that time and up to the present time.

Q. Did part of that consultation involve areas pertinent to what we now call the look-back program and procedure?

A. Yes.

Q. Part of that consultation involved receipt of legal advice regarding potential liability in AIDS litigation?

A. Yes.

Q. Have you had an opportunity to read the Plaintiffs' last amended petition in this case?

A. Yes.

Q. Have you been deposed for four days in this case?

A. Yes.

Q. Are the issues that you've been questioned about in this litigation similar to some of the issues that you addressed with Thompson & Knight during the time [sic] which Mr. Jacobson was there?

A. Yes.

During his deposition, Dr. Hill further testified:

A. The conversations would have, of course, related broadly to the challenges of AIDS, especially for blood centers, how to handle our aspect of the epidemic, would have entailed discussions of medical and related problems, the complexities of management, and asking for their legal input related to those matters. And in some cases it would have entailed discussing the nature of litigation rela-

tive to what we're observing in the [e]merging litigation regarding AIDS.

Q. [The Kuehns' attorney:] I wish you'd tell me, Doctor, the specific issues that are present in this case that you sought advice from Thompson & Knight about.

A. We sought advice about look-back.

Q. What sort of advice did you seek?

A. The legal issues regarding look-back.

Q. Tell me what those legal issues are.

[Wadley's attorney:] Well, I don't know that the doctor can tell you what the legal issues are,....

Q. [The Kuehns' attorney:] Tell me what you asked the lawyers to do for you.

[Wadley's attorney:] He's not a lawyer.

A. We asked them to define for us procedures, communications, and an understanding of the reasons for these regarding how to carry out a look-back program.

\* \* \* \* \* \*

I've been discussing, with some openness many, many phone calls, as issues would come up, and from time to time I have, without remembering every circumstance, responded to people in the blood bank who had a question that I thought they should consult with Thompson & Knight for that information since early in this AIDS thing, at least 1983, many, many times, and I can't remember the specifics of every time that that's been done. And certainly there were many, many confidences that were involved.

\* \* \* \* \* \*

It's difficult for me to give you a specific. We're talking about an enormously broad area. We're talking about years and years. We're talking about a whole series of actions being taken by the blood bank from '83 through the present. And for me to sort out from the conversations we've had [with] Thompson & Knight what line or item we might have in some action or a policy, I can't do that. It's difficult. Discussions are too wide ranging and we're talking about too many years ago. We're going back five years now.

At the same time, however, Dr. Hill's testimony made it clear that much of Wadley's consultation with Thompson & Knight concerning AIDS involved issues that were not necessarily relevant to the Kuehn litigation. For example, in response to a question from Wadley's attorney, Dr. Hill acknowledged that Wadley would have possessed a number of AIDS-related documents not relevant to the Kuehn litigation:

[Wadley's attorney:] Dr. Hill, that's a loaded question [posed by the Kuehns' attorney], and I'm going to make sure that you understand it. This Request asks for all documents basically that relate to the AIDS virus. Are all documents that relate to the AIDS virus in your institution relevant to this litigation in any way, shape or form?

THE WITNESS: I doubt it.

[Wadley's attorney:] I don't want you to tell [the Kuehns' attorney] that documents, that all documents related to the AIDS virus in your institution are relevant to this litigation unless that's what you intend to say.

THE WITNESS: I can't see how they would be.

Dr. Hill also stated that another law firm, Richards, Harris & Medlock, specializing in intellectual property, represented Wadley in a suit against another doctor, involving "technology involving AIDS testing." Dr. Hill also referred to consulting with Thompson & Knight about AIDS-related concerns in labor and personnel matters. Finally, Dr. Hill testified that he consulted with Thompson & Knight about the possibility of Wadley's instituting countersuits against plaintiffs (or their attorneys) bringing AIDS-related litigation.

▆▆▆ Dr. Hill's testimony indicates the broad scope of AIDS-related litigation that Wadley anticipated in the 1980s: for example, intellectual property disputes over scientific advances in AIDS-related technology; labor and personnel disputes; and countersuits, of an unspecified nature, that

Wadley might itself prosecute. In the testimony summarized up to now, there is nothing more specific. Dr. Hill makes the conclusory statement that the matters on which he consulted Thompson & Knight were substantially related to the Kuehn litigation. Yet a party moving to disqualify cannot rely upon conclusory statements; he must provide the trial court with sufficient information so that it can engage in a painstaking analysis of the facts. While a movant need not divulge any confidences, he must delineate with specificity the subject matter, issues, and causes of action presented in former representation. *Hydril Co. v. Multiflex, Inc.*, 553 F.Supp. 552, 554–55 (S.D.Tex.1982); *see also Braun v. Valley Ear, Nose & Throat Specialists*, 611 S.W.2d 470, 472–73 (Tex.Civ.App.—Corpus Christi 1980, no writ) (assertion of attorney-client privilege cannot prevent a trial court from making its own determination whether a movant meets the "substantial relationship" test).

■ Thus, the 101st Court did not abuse its discretion if it concluded that AIDS-related litigation could embrace a number of issues and claims unrelated to the Kuehns' personal injury action. A superficial resemblance between issues is not enough to constitute a substantial relationship, and facts that are community knowledge or that are not material to a determination of the issues litigated do not constitute "matters involved" within the meaning of the law. *Arkla Energy Resources v. Jones*, 762 S.W.2d 694, 695 (Tex.App.—Texarkana 1988, orig. proceeding). The mere fact that Wadley sought legal advice from Thompson & Knight concerning AIDS, especially at a time when AIDS was forcing itself upon the public consciousness generally, cannot establish a substantial relationship with the Kuehn litigation such that the 101st Court can be held to have abused its discretion in failing to find such a substantial relationship. Nor did it abuse its discretion if it concluded that simply a showing by Wadley that it consulted Thompson & Knight about its concerns over AIDS-related liability was insufficient to discharge Wadley's burden of showing that the matters involved in Thompson & Knight's representation of Wadley was substantially related to the matters involved in the Kuehn litigation. After a careful scrutiny of the record before this Court, we conclude that the only testimony introduced by Wadley that specifically touched upon issues potentially relevant to the Kuehn litigation was the testimony concerning the "look-back" procedure.

ii. *The "look-back" procedure*

The "look-back" procedure is a procedure involving identifying donors supplying AIDS-contaminated blood, tracing any donees who had previously received blood from such donors, and notifying those donees of the possibility that they may have become infected with the AIDS virus. Wadley's position was that it should adopt a "look-back" procedure of some kind, although other hospitals and blood banks had reservations:

Q. What about some blood banks? I understand that some blood banks took positions opposed to tracing and look-back programs for fear of the impact on the public's receptivity to accepting blood?

A. I think there were people within the blood bank community who also had to have it explained to them very carefully by individuals who felt that this should be done. There was a convincing and education job that had to be done.

Q. Did you ever put your position in favor of these tracing, look-back, notification programs in writing in any way? Did you write any papers, did you write letters, did you express yourself in such a way that we can go back and look and see expressions of your position in favor of these notifications?

A. My expressions that would be in writing would be internal, primarily. Such as things I had placed in the minutes that indicated that I had presented this.

Q. Can you provide me with copies of those?

A. I can provide those. I may have written a memo in November. I couldn't find it, but I seem to remember that in

November of '85 I not only presented this verbally and had it in minutes, but that I wrote a memo trying to explain why this had to be done.

Q. Excuse me. Will you explain to me now why you felt it had to be done?

A. People who received blood may still be potentially able to be a blood donor, number one. And no test in the history of medicine has ever been perfect, and we knew there would be some defects with this test on a theoretical basis. So I didn't want any of these people showing up somewhere to give blood. *Number two, people who received blood are sexually active and they had the potential to transmit to their sexual partners.* Three, people might be deciding to have pregnancies or children, and because of that, they need to know the HIV [an indication of possible AIDS infection] status in advance. Pregnancy is very bad for a woman who carries HIV we know today, but certainly we didn't want them catching it. There was a little bit known about HIV in infants who had probably gotten it from drug-abusing mothers, and we believe is a very bad disease, and we certainly wanted to—to set in motion something that would prevent those kind of events. And we felt that it was a moral obligation, it was a public health obligation, and it was even a legal obligation, and we did ask legal counsel to back us up on the notion as we made our presentations that it was a legal obligation.

Q. Did they do so?

[Wadley's Attorney:] I object to that. Don't reveal any attorney/client privilege between you and any attorneys that you may have consulted with.

A. Okay. But we contended to the hospital people that it was a legal obligation.

(Emphasis added.) This testimony gives sufficiently specific information so that a trial court might determine the subject matter (the "look-back" procedure), issues (whether to implement a "look-back" procedure and, if so, precisely how), and causes

of action (liability to those who might be harmed by the failure to implement a "look-back" procedure). Thus, the 101st Court was placed in a position in which it was able to determine, for itself, whether there was a substantial relationship between Thompson & Knight's representation of Wadley in the 1980's and the Kuehn litigation. The next question is whether Wadley's evidence concerning the "look-back" procedure is substantially related to the Kuehn litigation.

### B. The Kuehns' allegations

We now turn to the factual allegations asserted in the Kuehn litigation. The Kuehns' allegations are contained in their first amended original petition, the "live" pleading in the record.[4] It alleges: (1) that Jerry received a blood transfusion from Wadley on or after March 12, 1985; (2) that, before the transfusion, Wadley had in its possession a commercially feasible test to screen for contaminated blood; (3) that it failed to test the blood supply before the transfusion; (4) that it failed: (a) to warn Jerry of "[t]he true risks associated with accepting untreated or untested blood or blood products" or (b) to advise him that testing for contaminated blood was then available or would be available in the immediate future; (5) that, when Wadley did discover that the blood supply that Jerry had been given was in fact contaminated, it failed to notify Jerry promptly, but instead waited for about nine months before doing so; and (6) that it failed to warn him, at the same time, "[t]hat persons he came into close or intimate contact with were at risk of personal injury due to the close or intimate contact."

Thus, the gravamen of the complaint is the alleged harm caused to Jerry, primarily through Wadley's alleged failure to test its blood supply when it had the means to do so. The complaint appears to add the allegation that, even if Wadley failed to test the blood involved in the transfusion, it could have warned Jerry about the dangers of receiving untested blood so that he could have obtained prompt independent testing

---

**4.** We expressly do not comment on the effect, if any, of any later amended or supplemental petitions. We address only the nature of the Kuehn litigation as it is now before us.

elsewhere. In short, the petition complains about alleged tortious conduct by Wadley at the time of the transfusion. The "look-back" procedure, however, is a procedure not intended for use at the time of a transfusion, but for retrospective use, after a transfusion and whatever harm the transfusion has caused have already occurred.

The allegations, however, that Wadley is liable for failing to notify Jerry of the dangers attending the transfusion for "some 9 months" and to warn him that, during that time, he exposed those intimate with him to risk, clearly have a relationship to the issues involved with Wadley's implementation of a "look-back" procedure. In the quoted language emphasized above, Dr. Hill expressly stated that one reason for the "look-back" procedure was to prevent AIDS victims from spreading the virus to sexual intimates. Yet, under the facts of this case, the 101st Court could nonetheless have concluded that the relationship was not one "in which the factual matters involved were so related to the facts in the pending litigation that it create[d] a genuine threat that confidences revealed to [its] former counsel [would] be divulged to [its] present adversary." *NCNB Texas Nat'l Bank*, 765 S.W.2d at 400. A scrutiny of the chronology of events reveals why.

The Kuehns allege that Wadley did not notify Jerry of his exposure to the AIDS virus for "some 9 months" after the transfusion. Nowhere are we given the exact date when Jerry realized that he might have been exposed, but, because he allegedly received the transfusion on March 12, 1985, it is not unreasonable to conclude that his realization came late in the 1985 calendar year. There is ample testimony that Wadley consulted with Thompson & Knight generally about AIDS throughout the 1980's, but, for the reasons given above, we are concerned here only with Wadley's consultation specifically concerning the "look-back" procedure. Dr. Hill testified:

A. We sought advice about look-back.

Q. What sort of advice did you seek?

A. The legal issues regarding look-back.

\* \* \* \* \* \*

Q. [Wadley's attorney:] When did you do that? Is that the work that you explained to me?

A. That began sometime in the fall of '85 and extended into '86.

In the absence of any more exact dating, we cannot determine that whether Jerry received belated notice that he might be infected with the AIDS virus has any connection with Wadley's consulting Thompson & Knight about implementing the "look-back" procedure. There is no showing of a causal connection between Wadley's consultation with Thompson & Knight and Jerry's belated notice; to the contrary, the chronological sequence suggests that, by the time Wadley instituted any procedure based upon any advice given by Thompson & Knight, the questions whether and how to notify Jerry were already moot because he had already been notified in some way. We cannot say that the facts in this case establish a substantial relationship between the events as they actually occurred.

The very narrow question before this Court is not whether this Court itself might have granted Wadley's motion to disqualify, but only whether the 101st Court, by denying that motion, abused its discretion. A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex.1985). In this case, the 101st Court could have concluded that Wadley's generalized assertions about AIDS-related consultation were not sufficiently specific to identify any factual similarities between that consultation and the Kuehn litigation capable of being recited in a disqualification order. *NCNB Texas Nat'l Bank*, 765 S.W.2d at 400. The 101st Court could also have concluded that Wadley's specific assertions about consultation on the "look-back" procedure were irrelevant, because any harm caused to Jerry by any delay in being notified of the risk of AIDS contam-

ination had already occurred by the time that Wadley began seeking legal advice about the "look-back" procedure. Therefore, we cannot say that Wadley's evidence clearly established a substantial relationship between its consultation with Thompson & Knight in the 1980's and the Kuehn litigation, such that the 101st Court abused its discretion.

In the absence of conclusively establishing a substantial relationship, Wadley cannot show a clear violation of Canon 9, which obligates attorneys to avoid even the appearance of impropriety. The Supreme Court has explicitly rejected the theory that "two representations [that are] 'similar enough' ... give an 'appearance' that confidences which could be disclosed 'might be relevant' to the representations," thus, an appearance of impropriety. *NCNB Texas Nat'l Bank*, 765 S.W.2d at 400. For this reason also, *Hoggard* is distinguishable; in that case, we held that there was a clear and present violation of Canon 9. *Hoggard*, 770 S.W.2d at 583. Thus, *Hoggard* involved an "immediate and palpable harm" justifying conditionally granting mandamus relief. *Id.* But if the 101st Court could have concluded that Wadley failed to meet its burden of showing a substantial relationship, then it could necessarily have concluded that Wadley failed to show any harm by Dawson & Sodd's continued representation of the Kuehns.

### 3. *The presumption of Jacobson's knowledge*

■ Further, the presumption that Jacobson held confidences and secrets imparted by Wadley to Thompson & Knight is conclusive only upon Wadley's establishing a substantial relationship. Because Wadley did not clearly establish a substantial relationship, that presumption remained rebuttable. At the disqualification hearing, Jacobson testified as follows:

Q. At this time or any time prior to this time are you in possession or do you have any knowledge of confidential matters, secrets, confidences, facts, or advice given by the firm of Thompson & Knight at any time to anyone connected with Wadley including Dr. Norwood Hill?

A. I have none.

Q. At the time you were employed at Thompson & Knight were you aware that Wadley was a client of Thompson & Knight?

A. No, sure wasn't.

Q. Have you shared any confidences or secrets of Thompson & Knight with any member of my firm [Dawson & Sodd] including myself and Ron Edmondson and Matt Dawson?

A. No.

Q. Do you have any to share?

A. No, nothing.

This testimony was clearly offered in rebuttal of the presumption that Jacobson possessed any confidences that Wadley had imparted, and, because the presumption in this case was rebuttable, the 101st Court did not abuse its discretion in crediting the testimony. In *Petroleum Wholesale*, there was no dispute that the attorney formerly associated with the firm representing the movant to disqualify had had actual knowledge of confidences involved in the movant's representation. *Petroleum Wholesale*, 751 S.W.2d at 296. Therefore, that case did not involve even a conclusive presumption, but an undisputed fact. In this case, the question is only whether the Kuehns could have rebutted the presumption of shared confidences imparted to Jacobson. Having concluded that they could, we also conclude that the 101st Court was not without discretion to find that they had done so.

### 4. *Disqualification of the entire firm*

A. Members other than Jacobson

■ Even if we were to conclude that Wadley met its burden of establishing a substantial relationship between Wadley's representation by Thompson & Knight and the Kuehn litigation, we, nevertheless, conclude that the 101st Court did not abuse its discretion in failing to disqualify the entire law firm of Dawson & Sodd. If Wadley had met its burden, the result would have been the conclusive presumption that Jacobson did have confidences imparted to him by Wadley. *NCNB Texas Nat'l Bank*,

765 S.W.2d at 400; *Hoggard,* 770 S.W.2d at 583; *Petroleum Wholesale,* 751 S.W.2d at 299. In light of Jacobson's testimony, however, the 101st Court could have concluded that, even if individually disqualified, Jacobson had only imputed knowledge of matters affecting the Kuehns. But Dawson & Sodd, as a whole, would not be disqualified by imputing knowledge to it that was in itself imputed to Jacobson. *Enstar Petroleum Co. v. Mancias,* 773 S.W.2d 662 no. 89–166 (Tex.App.—San Antonio 1989, orig. proceeding) (per curiam) 773 S.W.2d at 664; State Bar of Texas, Comm'n on Interpretation of the Canon of Ethics, Op. 453, *reported at* 51 TEX.B.J. 293 (1988); *see also Petroleum Wholesale,* 751 S.W.2d at 299 (noting the Fifth Circuit's rejection of a "double imputation" theory).

In *Petroleum Wholesale,* the chain by which the movant's confidences, imparted to the old firm, appeared to be exposed to the new firm contained only one link of imputation: the link between the newly hired attorney and the other members of the new firm. *See Petroleum Wholesale,* 751 S.W.2d at 299–300. In this case, the disqualification of the entire firm of Dawson & Sodd could result only if there were two links of imputation: imputing knowledge of Wadley's confidences to Jacobson, and then imputing Jacobson's imputed knowledge to the other members of Dawson & Sodd. There must be a limit to how much imputation can be done in creating an appearance of impropriety. Indeed, the Supreme Court has stated that it will not indulge a presumption, absent any affirmative showing supporting it, that an attorney has unethically revealed the confidences of a former client to a present client:

Although the former attorney [here, Jacobson] will not be presumed to have revealed the confidences to his present client [the Kuehns], the trial court should perform its role in the internal regulation of the legal profession....

*NCNB Texas Nat'l Bank,* 765 S.W.2d at 400. Thus, when an attorney has actual knowledge of a former client's confidences, disqualification of that attorney's present associates may result, not because his knowledge is imputed to those associates, but because the trial court is to perform its role in avoiding any appearance of impropriety. It is that appearance of impropriety that results in disqualification of the new firm, not the second imputation of knowledge already once imputed.

We conclude that no imputation of Jacobson's knowledge to other members of Dawson & Sodd arises, absent any showing that Jacobson had actual, or conclusively presumptive, knowledge of Wadley's confidences. We hold that, because Jacobson's knowledge was imputed, not actual, knowledge, there arose no appearance of impropriety sufficient, as a matter of law, to mandate the disqualification of the entire firm of Dawson & Sodd. We should not be understood to say that disqualification might never be appropriate in a case in which an attorney with imputed knowledge of a former client's confidences joins a firm representing a client with adverse interests, however. We hold only that, in this case, the 101st Court did not abuse its discretion by failing to find any appearance of impropriety.

**B. Jacobson individually**

Indeed, Wadley itself appears to concede that the disqualification of the entire firm of Dawson & Sodd was discretionary with the 101st Court. In its brief, Wadley asserts that:

No doubt Dawson & Sodd could have prevented disqualification of the entire law firm by screening Mr. Jacobson off from this case, or at least by not having Mr. Jacobson actively participate in the prosecution of this case. However, Dawson & Sodd chose to make Mr. Jacobson an integral member of the "team" prosecuting the *Kuehn* case.

The argument appears to be that, if Dawson & Sodd had "screened" Jacobson off from the Kuehn litigation by constructing a Chinese wall around him as soon as Jacobson's previous association with Thompson & Knight became known, Dawson & Sodd itself would be immunized from challenge. We expressly do not decide that question today. We note only that: (1) our record

reflects that Jacobson's name appears as a signatory on the Kuehns' first amended original petition filed on June 9, 1988; and (2) Wadley's motion to disqualify was filed on September 8, 1988, three months later. The 101st Court might have concluded that, between the June and September dates, Wadley learned of Jacobson's involvement in the Kuehn litigation and that during that same period Jacobson could have imparted whatever knowledge, if any, that he did have to other members of Dawson & Sodd. The 101st Court might have concluded that whatever harm happened to Wadley as a result of Jacobson's involvement with Dawson & Sodd had already occurred, so that the motion to disqualify was effectively moot. *See Harmar Drive-In Theatre v. Warner Bro. Pictures,* 239 F.2d 555, 558 n. 3 (2d Cir.1956) (Clark, C.J., dissenting).

We should not be understood to say that Wadley in fact or as a matter of law filed its motion to disqualify untimely. We express no opinion on how promptly a party must act after he learns that an adversary attorney might have gained that party's confidences in a prior representation. Nor do we express any opinion on Dawson & Sodd's persistence in involving Jacobson in the Kuehn litigation after its realization that Jacobson worked for a law firm that formerly represented Wadley, or the appearance created thereby. We stress again that the narrow issues before this Court, in determining whether mandamus relief is appropriate, are whether Wadley can show an immediate and palpable, as opposed to a speculative, harm, and whether the trial court abused its discretion.

Mandamus is an extraordinary remedy. It will not be issued to control the 101st Court's ruling on Wadley's motion to disqualify, unless Wadley can show that, by denying the motion, the 101st Court committed a clear abuse of discretion. *Arkla Energy Resources,* 762 S.W.2d at 696. Wadley has not conclusively shown a substantial relationship existing between the matters on which Wadley sought Thompson & Knight's legal advice and the Kuehn litigation. Nor has Wadley shown that Jacobson in fact ever obtained any of Wadley's confidences. To evaluate the "appearance of professional impropriety" requires a subjective test best left to the trial courts in their broad discretion. *Braun,* 611 S.W.2d at 472. In the absence of Wadley's showing that the 101st Court committed a clear abuse of discretion, we decline to disturb the 101st Court's exercise of that discretion.

### 5. *Conclusion*

Wadley has shown this Court no immediate and palpable harm caused by the 101st Court's denial of its motion to disqualify. On the record before it, the 101st Court could have concluded that Wadley failed to show a substantial relationship between the matters for which Wadley sought advice from Thompson & Knight (at least before and during the time in which the events giving rise to the Kuehn litigation occurred) and the Kuehn litigation itself. Even if the 101st Court had concluded that a substantial relationship existed, it could have concluded that Wadley had not shown itself entitled to the disqualification of the entire law firm of Dawson & Sodd and that, with respect to the disqualification of Jacobson individually, the motion was moot by the time it was filed. Therefore, we conclude that the 101st Court, in denying Wadley's motion to disqualify, did not abuse its discretion.

Wadley's petition for writ of mandamus is denied.

HOWELL, J., concurs.

HOWELL, Justice, concurring.

I fully concur in the judgment. I write separately because this is an area where bright lines need to be drawn for the guidance of bench and bar. It is clear that there was no disqualification in this case and we should make a direct holding to this effect.

In reality, there are two rules of professional conduct that possibly come into play in situations of this nature. The first may appropriately be described as the rule against dual representation. Such rule provides that an attorney may not withdraw his representation of one side of a

litigation and thereafter undertake the representation of the opposing side. The second may be aptly called the rule against any representation that is unfair to a former client.

The rule against dual representation is monolithic and rigorous; it recognizes few exceptions, if any. For a lawyer to switch sides with respect to a pending litigation exposes him to the possible charge that he is unprincipled, without essential loyalty, and interested in money-grubbing rather than justice. If the law permits him to do so, the law itself is exposed to the possible charge that advocacy is little more than the equivalent of prostitution. The rule against dual representation is of ancient origin. Quite possibly, it runs back to the time when lawyers were the knights of the royal court and they were expected to champion the cause of their clients in battle. The rule that no man can serve two masters is at least as old as the Bible.[1]

Although the danger that confidences may be breached is inherent in the dual representation situation, an equally cogent basis for the rule is that a lawyer may not be permitted to maneuver himself toward the representation of the more rewarding side of a case. The most affluent litigant may not be permitted to hire away his adversary's lawyer; strict rules must be erected against any such contingency.

In final analysis the rule is a simple declaration of public policy, a device for the protection of the public concept of the system of justice. The gist of the rule is that a lawyer may not represent adversaries in the same or in substantially similar litigation, either concurrently or successively, even with the express and informed consent of everyone involved.

In *Petroleum Wholesale, Inc. v. Marshall*, 751 S.W.2d 295 (Tex.App.—Dallas, 1988, orig. proceeding), this Court extended the rule against dual representation to entire law firms. If during the course of the same litigation, Lawyer I (the lawyer complained about) departs from Firm I, which is involved in the representation of Client I (the offended party), and if Lawyer I then affiliates with Firm II (the firm sought to be disqualified), which is involved in the representation of Client II, an adversary to the same litigation, the mere affiliation between Lawyer I and Firm II acts as an automatic disqualification of Firm II to participate in the litigation. A "Chinese wall" between Lawyer I and Firm II will not remedy the situation. The reason: The rule or policy against dual representation has been breached; public policy forbids the relationship.

Because the rule against dual representation is rigorously applied, it must have strict limitations. Actual litigation must be involved; without actual litigation, the rule against dual representation is inapplicable. The same or substantially the same cause of action must be involved. The parties must be the same or must be closely affiliated.

Even though the same or substantially the same litigation must be involved, the contamination period is not strictly limited to the time that the litigation is formally pending. It should properly begin when Client I first consults with Firm I with respect to a specific claim or dispute with respect to a particular party. It should continue, at least until the resulting litigation has been fully resolved. During that period, the mere fact that Lawyer I has moved to Firm II operates as an automatic disqualification, not only of Lawyer I himself, but also of his new-found affiliate, Firm II.

The writer fully agrees with the result in *Petroleum*, 751 S.W.2d at 295. However, in the view of the writer, the true basis in *Petroleum*'s ruling was not fully recognized. *Petroleum* should have been bottomed on the rule against dual representation. The discussion of imputed knowledge and presumed prejudice only serves to obscure the fact that the rule against dual representation, as a matter of policy, simply forbade Firm II from continuing to

---

1. [From Christ's Sermon on the Mount] No man can serve two masters; For either he will hate the one, and love the other; or else he will hold to the one, and despise the other. Ye cannot serve God and mammon.
MATTHEW 6:24 (King James ed.)

represent Client II after Attorney I came on board.

*Petroleum* also stressed the fact that Attorney I "had actual knowledge of the confidences of a former client in a particular case." *Id.* at 301. It is the view of the writer that in a simpler day when any grouping above, say six lawyers, was generally considered a large lawfirm, no such showing was necessary and the mere fact that Lawyer I had left Firm I and joined Firm II constituted an automatic disqualification of the latter. In view of the fact that lawfirms continue to grow in size and even operate multiple offices in distant cities, the time is approaching when some limitation must be placed on the automatic disqualification feature of the rule, but the nature of such limits are beyond the proper scope of this opinion.

As compared with the rule against dual representation, the rule against representation unfair to a former client is far less severe in its application but far broader in its sweep. All that it required is that the complainant must be a former client of Lawyer I, the lawyer complained about, or his firm. Primarily, the gist of this latter rule is the possible breach of the confidences of the former client. There need not even have been actual litigation. It is not necessary that Client I consulted Firm I about litigation at all or that litigation ever ensue. Wherever the situation is such that breach of confidence or similar unfairness is implicated, Lawyer I is disqualified to accept the retainer of Client II. The extent to which Firm II may be disqualified by the mere fact that Lawyer I has joined them is a question that requires close analysis. There are no absolutes.

The case of *NCNB Texas National Bank v. Coker*, 765 S.W.2d 398 (Tex.1989) did not involve the rule against dual representation. In *NCNB*, Client I, which was the defendant, complained that Firm I, now representing the plaintiff's attorneys had represented it, the defendant when it was a plaintiff, "in a prior suit" against another party. Thus, it even appears that the allegedly disqualifying litigation was concluded. Therefore, only the second rule, the rule

against unfairness toward a former client could have been involved. In this instance, the Supreme Court held that trial courts "must adhere [hold the complainant, Client I] to an exacting standard when considering such motions." *Id.* at 399. The burden is on the former client to "establish a preponderance of the facts indicating substantial relation between the two representations." Finding that Client I, the former client had failed to make the necessary showing, the Supreme Court held that the trial court had committed an abuse of discretion of the degree required in order to obtain a writ of mandamus, and held that the order of disqualification must be set aside.

Both *Petroleum*, 751 S.W.2d at 295 and *NCNB*, 765 at 398 are eminently correct on their own facts. Any seeming conflict, or any inability to reconcile them is attributable to the fact that neither takes notice that two different rules are involved. Unfortunately, there is much additional confusion in the cases on attorney disqualification, the greater part being attributable to the failure to distinguish which rule is to be applied. Unfortunately, today's majority has done little to resolve the confusion.

In the case now before us, the relator has strenuously argued *Petroleum*. However, *Petroleum* is based on the rule against dual representation. Attorney I, Mr. Jacobson, was never affiliated with Firm I (Cowles and Thompson, who represent Client I, the complainant, in the action that underlies this mandamus). His affiliation was with Thompson and Knight which has never participated in the current action below. Thompson and Knight's only involvement is that they were consulted by Client I, not with respect to the specific underlying lawsuit, but with respect to the general area of liability from which the lawsuit emanates. *Petroleum*, 751 S.W.2d at 398 is inapplicable because there has been no dual representation, by imputation or otherwise.

Relator's case only implicates the second rule, the rule against representation that is unfair to a former client. It is true, in an abstract sense that Attorney I did, while he

was an affiliate of Thompson and Knight, have Client I as his client. However, reference to Martindale–Hubbell discloses that Thompson and Knight is a large lawfirm with well over one hundred lawyers as its affiliates, VI Martindale–Hubbell Law Directory, P. 2599B–2605B (1989 ed.).

Attorney I testified before the respondent judge without controversion that he never knew that Client I was, in fact a client of Thompson and Knight. The only countervailing contention is that he could reasonably have seen some of the papers relating to Client I laying around or he could reasonably have been present while the affairs of Client I were being discussed between associates or employees of the firm. Clearly, under *NCNB,* 765 S.W.2d at 398, where only the rule against unfairness is involved, there are no presumed disqualifications; ergo, no disqualification may be imputed. An "exacting standard" is called for. *Id.* at 399. With no presumptions to be invoked in its favor, with no evidence other than evidence of propinquity, it is clear that relator did not meet the requirements for the disqualification of opposing counsel that were laid down by *NCNB.*

From what has been said, we must find that Attorney I, himself was not disqualified from participating in the underlying lawsuit. It follows that Firm II could not have become disqualified by reason of his affiliation with them. Furthermore, inasmuch as Client I failed to carry its burden and failed to meet the "exacting standard" laid down by *NCNB,* the trial court had only one option; it was obligated to overrule the motion for disqualification.

I therefore concur in today's judgment. I do not agree with the inferential holding of the majority to the effect that the abuse of discretion standard should control the outcome of this mandamus. The trial court made the only ruling that was permissible on the evidence before him when he overruled relator's motion to disqualify the lawyers representing relator's adversaries.