# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00750-CV

**Capital City Church of Christ, Appellant**

**v.**

**Ralph Martin Novak, Jr.; Robert E. Reetz, Jr. and Hilgers & Watkins P.C., Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. GN303974, HONORABLE PETER M. LOWRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an appeal from a summary judgment granted on claims asserted by the Capital City Church of Christ (the church),[1] against appellees Hilgers & Watkins, P.C. (the firm), and two of its partners, Ralph Martin Novak, Jr., and Robert E. Reetz, Jr.[2] (the defendants). We affirm.

The church sued the defendants for breach of fiduciary duty based on the defendants' representation of Sam Chen, Inc. (Chen) in a 2003 dispute with the church. The church and Chen had been co-owners of a six-story building at 804 Congress Avenue in Austin (the building) since October 1996. Their relationship was governed by a Co-Ownership Agreement that, to summarize, contemplated that they would rent office space in the building to third parties, made the church

---

[1] In the record, appellant is also termed the "Church of Christ, Capital City Congregation, Inc." or "CCCCC." However, appellant's briefing uses "Capital City Church of Christ," and we will do the same.

[2] The firm has since merged with Brown McCarroll, L.L.P., and Reetz and Novak are both partners in that entity.

responsible for the building's physical facilities, and made Chen responsible for finances and accounting under the arrangement. Over time, the relationship between the church (particularly, the church's contact, Jim Colley[3]) and Chen deteriorated, with Colley accusing Chen of self-dealing or other malfeasance and Chen accusing Colley of mismanaging the building. In late 2002, the church and Chen agreed to work toward implementing a condominium regime under which each would own separate floors of the building. Originally, the law firm of Armbrust & Brown represented the co-owners jointly but, as negotiations deteriorated and conflicts arose, Chen hired Hilgers & Watkins as its separate counsel.

Upon learning of the firm's representation of Chen, the church and Colley raised concerns that the firm had a conflict of interest based on its prior representation of the church.[4] We will discuss this prior representation in detail below, but to summarize, it is undisputed that the firm's legal work for the church took place between 1996 and early 1998 and principally involved

---

[3] Colley identified himself as the church's "Pulpit Minister."

[4] In response to this concern, Reetz sent Colley a letter in which he explained that the firm's "representation was over six years ago and involved lease issues with tenants of the building." Reetz further explained:

> Our code of ethics requires us to either withdraw or obtain a waiver if there is a conflict of interest wherein the matter is "substantially related" to the prior representation of the adverse party. I have provided copies of the work that Hilgers & Watkins did on behalf of Capital City Congregational Church of Christ in 1997 to Tom Watkins, our senior partner who reviews all ethics questions on behalf of the firm. It is his opinion that the nature of the prior representation does not meet the threshold test of "substantially related" matter. . . . Therefore, we maintain that we may continue representing Sam Chen, Inc. with regards to the co-ownership agreement.

2

disputes with tenants in the building. It is also undisputed that the church was represented by other counsel when executing the 1996 Co-Ownership Agreement and a subsequent 2002 amendment.

The church filed the underlying lawsuit in October 2003. Defendants withdrew from representing Chen shortly thereafter. Chen and the church ultimately resolved their dispute through arbitration.

The sole claim that the church asserts is that the firm, Novak, and Reetz breached their fiduciary duties to the church as a former firm client by misusing confidential information obtained through that relationship to further their representation of Chen. The elements of a breach-of-fiduciary-duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) a breach by the defendant of his fiduciary duty to the plaintiff; (3) which must result in injury to the plaintiff or benefit to the defendant. *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). In the context of an attorney-client relationship, "[a]n attorney breaches his fiduciary duty when he benefits improperly from the attorney-client relationship by, among other things . . . improperly using client confidences." *Gibson v. Ellis*, 126 S.W.3d 324, 330 (Tex. App.—Dallas 2004, no pet.) (citing *Goffney v. Rabson*, 56 S.W.3d 186, 193 (Tex. App.— Houston [14th Dist.] 2001, pet. denied)); *see also Aiken v. Hancock*, 115 S.W.3d 26, 28 (Tex. App.—San Antonio 2003, pet. denied) (distinguishing between breach-of-fiduciary-duty claims against lawyers and malpractice claims).

The defendants do not dispute that their prior attorney-client relationship with the church gave rise to a fiduciary relationship. *See Meyer v. Cathey*, 167 S.W.3d 327, 330-31 (Tex. 2005). Their focus has instead been the remaining elements, existence of a breach and injury

3

or damages. The defendants sought traditional and no-evidence summary judgment that, as a matter of law, (1) there was no "substantial relationship" between the facts and issues of their former representation of the church and their subsequent relationship of Chen; (2) no confidential information of the church was used or disclosed in their subsequent representation of Chen; and (3) no injury and no damages were caused by their representation of Chen. The district court granted the motion explicitly on each ground. The first two summary judgment grounds both relate to the breach element of the church's breach-of-fiduciary-duty claim. The church appeals from this ruling—disputing all three summary judgment grounds—and from a discovery ruling that we will discuss later.

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 291 n.4 (Tex. 2004) (citing *Knott*, 128 S.W.3d at 215-16). Furthermore, "[a] defendant who conclusively negates at least one of the essential elements of the plaintiff's cause of action is entitled

to summary judgment." *Little v. Texas Dep't of Crim. Justice*, 148 S.W.3d 374, 381 (Tex. 2004) (citing *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995)).[5]

**Evidence of breach**

Defendants have presented undisputed summary judgment evidence that they have not actually used or divulged to Chen the church's confidential information. Further, while making some vague and conclusory allusions that it discussed information regarding "purchase," "operation," or "leasing" of the building with defendants, the church has not identified any specific *confidential* information that it conveyed to the defendants during their prior representation. To the contrary, the summary judgment evidence reflects that the prior representation involved communications with tenants or other third parties[6] and issues principally concerning matters known to third parties, such as the terms of their lease agreements or the physical features of the building.[7] The church instead seeks to rely on a series of presumptions (or, the church suggests, at least the rationale underlying them) that operate when a former client seeks to disqualify a former attorney from subsequently representing an adverse party.

A former client may seek to disqualify a former attorney from representing a subsequent adversary based on the threat that the attorney will intentionally or inadvertently reveal

---

[5] The church objects to our consideration of an exhibit the firm filed with its appellate brief that purports to demonstrate a timeline of relevant events in this case. We have relied only on the evidence in the record.

[6] Novak, who represented the church in the prior matters, testified that he knew of no information given to him by the church in the course of that representation that the church asked him not to share with the third parties involved.

[7] E.g., leaks in the roof, elevator carpeting.

the former client's confidences during the later representation. The former client must establish a preponderance of the facts demonstrating a "substantial relationship" between the two representations by proving "the existence of a prior attorney-client relationship in which the factual matters involved were so related to the facts in the pending litigation that it creates a genuine threat that confidences revealed to his former counsel will be divulged to his present adversary." *NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex. 1989). Sustaining this burden requires "evidence of specific similarities capable of being recited in the disqualification order." *Id*. If the former client can meet this burden, it is conclusively presumed that the former client revealed confidences and secrets to the attorney that would be at risk of disclosure in the current representation. *Id*. "In this manner, the movant is not required to reveal the very confidences he wishes to protect." *Id*. Further, by proving the substantial relationship between the two representations, the movant also establishes as a matter of law that "an appearance of impropriety exists." *Id*. As such, "[a]lthough the former attorney will not be presumed to have revealed the confidences to his present client, the trial court should perform its role in the internal regulation of the legal profession and disqualify counsel from further representation in the pending litigation." *Id*.

The church asserts that there is a "substantial relationship" between the defendants' prior and subsequent representation and that the presumptions that arise in the disqualification context should serve as a substitute for the traditional proof requirements on its breach-of-fiduciary-duty claim. To date, there is no reported Texas authority to support our applying the "substantial relationship" analysis in this manner. In the sole reported case presenting that question, the Dallas Court of Appeals refused to "substitute a conclusive presumption, which exists for disqualification

6

purposes, for real evidence" in a former client's breach-of-fiduciary-duty claim against a law firm, and held that the presumption "cannot raise a fact issue on disclosure of confidences." *City of Garland v. Booth*, 895 S.W.2d 766, 773 (Tex. App.—Dallas 1995, writ denied). Relying on proof similar to that which defendants present here, the court affirmed summary judgment in favor of the firm. *Id.* at 772-73.

The church counters that an unpublished opinion from the Amarillo Court of Appeals creates "a split . . . as to whether the presumption of disclosure found in attorney disqualification cases is applicable to actions for breach of fiduciary duty." *See Reppert v. Hooks*, No. 07-97-0302-CV, 1998 Tex. App. LEXIS 5552 (Tex. App.—Amarillo Aug. 28, 1998, pet. denied). In fact, *Reppert* follows similar logic as *Booth* in observing that while "[i]n the disqualification mode, the applicable test is whether there is a genuine *threat* of disclosure, rather than an actual disclosure," a breach-of-fiduciary-duty claim requires the plaintiff "to show an *actual* disclosure to recover." 1998 Tex. App. LEXIS 5552, at *28. The Amarillo court found that the evidence raised a fact issue regarding actual disclosure and, as the church emphasizes, its analysis appears to give some weight to the "difficulty of showing the revelation of confidences by a former attorney." However, the court relied upon actual evidence that the former client had conveyed specific confidential information to the attorney in connection with the client's purchase of a note that later was the basis for the very claims that the attorney filed against the former client. *Id.* at *28-29.

We conclude that the presumptions that arise from a "substantial relationship" between prior and subsequent representations in the attorney disqualification context cannot

substitute for the traditional requirement that the church support its breach-of-fiduciary-duty claim with evidence. *Booth*, 895 S.W.2d at 772-73. That is not the purpose or effect of the presumption. Establishing a "substantial relationship" between the prior and subsequent representation for disqualification purposes does not give rise to a presumption that confidences obtained in the prior representation have actually been disclosed to the present adversary. To the contrary, "the former attorney will *not* be presumed to have revealed the confidences to his present client." *Coker*, 765 S.W.2d at 400 (emphasis added). A "substantial relationship" instead gives rise to an "appearance of impropriety"—a basis for disqualification, not an element of a tort claim—that derives from the perceived *risk* that confidential information will be disclosed. *Id.*

We conclude, as did the *Booth* court, that a "substantial relationship" between prior and subsequent representations, standing alone, "cannot raise a fact issue on disclosure of confidences," 895 S.W.2d at 773, and that the district court properly granted summary judgment on the ground that, as a matter of law, no confidential information of the church was used or disclosed in the defendants' subsequent representation of Chen.

**Substantial relationship**

Alternatively, we agree with the district court that the church failed to raise a fact issue regarding a "substantial relationship" between the defendants' prior representation of the church and their subsequent representation of Chen. The "substantial relationship" standard requires the former client to prove specific factual similarities, liability issues, or strategies from the prior representation that are so closely related to those of the subsequent representation as to "create[] a

8

genuine threat that confidences revealed to his former counsel will be divulged to his present adversary." *Texaco, Inc. v. Garcia*, 891 S.W.2d 253, 256-57 (Tex. 1995); *Coker*, 765 S.W.2d at 399-400; *see Spears v. Fourth Court of Appeals*, 797 S.W.2d 654, 656 (Tex. 1990) ("[M]ere allegations of unethical conduct or evidence showing a remote possibility of a violation of the disciplinary rules will not suffice."). Conclusory statements about similarities in the representations are not sufficient; instead, the standard requires sufficiently specific delineation of subject matter, issues, and causes of action presented to enable the trial court to engage in a "painstaking analysis of the facts." *J.K. & Susie L. Wadley Research Inst. & Blood Bank v. Morris*, 776 S.W.2d 271, 278 (Tex. App.—Dallas 1989, no writ). Likewise, "[a] superficial resemblance between issues is not enough to constitute a substantial relationship." *Id.*; *see In re Drake*, 195 S.W.3d 232, 236-37 (Tex. App.—San Antonio 2006, no pet.) (mere fact that lawyer had long represented county tax appraisal district in suits over valuation of property, involving similar defenses and strategies, did not establish "substantial relationship" with subsequent valuation dispute in which counsel represented property owner). Nor does an attorney's mere generalized knowledge of a client's "inner workings" in regard to selecting experts or fact witnesses, "preparing and responding to discovery requests, formulating defense strategies, trial preparation, and attending settlement conferences" constitute the required "specific factual similarities" between prior and subsequent representations. *In re Drake*, 195 S.W.3d at 236-37. Further, a "substantial relationship" cannot be predicated upon the perceived risk of disclosure of facts that are common knowledge, within the public domain, or that have already been provided to the present adversary. *Metropolitan Life Ins. Co. v. Syntek Fin. Corp.*, 881 S.W.2d 319, 321 (Tex. 1994); *Wadley*, 776 S.W.2d at 278.

9

We begin by comparing the summary judgment evidence regarding defendants' prior representation of the church and their subsequent representation of Chen.

### The church vs. Chen dispute

In 1996, the church purchased the building. In October of that year, the church sold a 2/3 undivided interest in the building to Chen, retaining an undivided 1/3 share. Also in 1996, the two entities executed a Co-Ownership Agreement for the purposes of jointly maintaining, renting, or selling the building as a commercial office building and sharing in revenue and expenses. Attorney John F. Campbell represented the church in these transactions, while Anthony Goodall of Goodall & Davison represented Chen.

In its original form, the Co-Ownership Agreement specified that the church and Chen each would have the right to occupy or sublease certain assigned floors of the building,[8] with no obligation to pay those rents and charges to the co-ownership, and to jointly lease the remaining floors. The agreement further provided that the church would manage all physical assets of the Co-Ownership and be responsible for repairs and maintenance of all assets, while Chen would manage all financial matters and be responsible for collecting and accounting for revenues and payment of expenses and debt service.

By August 2002, disputes had begun to arise between the church and Chen. There is evidence suggesting that these conflicts were attributable to some extent to financial strains on the co-ownership caused by a loss of tenants and difficult market conditions. On or about August 2002,

---

[8] The church had the right to occupy or sublet the second floor of the six-story building, and Chen the fifth and sixth floors.

Comerica Bank, a major tenant of the building, gave notice of its intent to terminate its lease later that year. Correspondence reflects that counsel Bob Burton of Armbrust & Brown had negotiated a lease agreement between the church and Comerica in 1996 for tenancy of the first and third floors of the building, and that, in 2001, Comerica had negotiated a renewal of its lease and a right to terminate upon six-months' notice. The church proposed to Chen that the co-ownership again retain Burton "to handle matters regarding the Comerica lease," as he "has represented the Co-ownership's interests regarding this particular tenant over the past six years." Chen instead engaged Goodall—the attorney who had represented Chen in purchasing its interest and negotiating the Co-Ownership Agreement—to "draft a letter . . . advising the bank of its obligations regarding the termination of the lease," including payment of "escalation rents (pass through expenses)." Colley insisted that Burton should serve as the co-ownership's counsel in connection with the matter, expressing concern that "the Church and Sam Chen may have conflicting interests with respect to Comerica Bank's tenancy and/or lease termination." Chen also began the process of hiring a broker, presumably to assist in re-leasing the Comerica space. Subsequently, Burton, representing the co-owners, communicated to Comerica a willingness to "explore any and all options which would enable [Comerica] to remain in the Building." The record reflects that Comerica vacated the building in November 2002, although it paid rent through mid-December.

Also in November, the church and Chen executed a First Amendment to their Co-Ownership Agreement. Among other changes, the parties expanded their respective rights of occupancy (and corresponding exclusive rights to rent revenues), dividing all remaining floors of the

11

building between them.[9]  They also agreed to negotiate in good faith to replace, within six months, their tenancy-in-common with a condominium regime under which each would independently own their respective floors.  Burton began work on the necessary instruments and, in February 2003, transmitted to each co-owner a binder of proposed documents for the "Hogg-Gregory Office Condominiums."  Burton noted that "the co-owners will need to reach agreement on the common interest allocation for each unit," which "specify the percentage interest in the general common elements attributable to each unit and determine the percentage of the annual budget of the Association paid by each unit owner."  Burton also requested that the co-owners review the proposed declarations, articles, and bylaws "with respect to the number of directors and the percentage vote required for certain actions by the Association."

On March 28, 2003, Chen wrote Burton advising that "[a]fter reviewing your proposed condominium documents for the Hogg-Gregory Office Condominiums, Sam Chen, Inc. . . . must completely oppose your proposal."  Chen accused Burton of "grossly neglect[ing] Chen's interest" and that "[i]n order to safeguard the assets of Chen, I must terminate your legal services to Chen."  On March 31, Burton wrote Colley and Chen requesting a conflict waiver to enable him to continue representing the church.  On the same day, Chen met with Reetz, and Hilgers & Watkins began to provide legal services to Chen.

In the months that followed, Reetz, Novak, and other firm attorneys billed time to Chen related to the condominium conversion, including research concerning "condominium statutes"

---

[9]  In addition to its pre-existing rights to the fifth and sixth floors, Chen was given rights to the first and fourth floors.  The church, which previously had rights to the second floor, also received rights to the third floor.

12

and rules, zoning issues, and the property tax status of nonprofit or tax-exempt organizations. On June 2, billing records reflect that Reetz began working on a letter "in response to Colley letter." Colley's letter is not in the summary judgment record, but the record does include a June 17 letter from Sam Chen to Colley responding to "your letter dated June 2, 2003." Chen appears to take great offense to whatever Colley's letter said, alluding to "twelve pages and twenty-five exhibits" of "machinations and delusional lies," urging Colley to "consult a psychiatric counselor," and accusing him of "childish behavior" and "language inappropriate coming from a minister." Other comments in Chen's letter suggest that Colley's letter may have been prompted by financial demands that Chen had made on the church to fund the co-ownership amid dwindling revenues.

Much of Chen's letter concerns Colley's apparent personal attacks of Chen, but several issues are raised concerning various aspects of Property management and the parties' rights under the Co-Ownership Agreement:

- A dispute over Colley's "questionable" use of petty cash to purchase items for uses that Chen viewed as unrelated to running an office building or that were unnecessary in light of building occupancy or existing janitorial service contracts.

- Disputes over the parties' respective efforts to locate tenants for the building. Chen argued that the building had over 80% occupancy between 1999-2002 and that, after a tenant, BAM!, had vacated fourth-floor space, Chen had immediately hired a broker on a six-month contract to find a tenant. Chen attributed the loss of Compass Bank to Colley's "harsh to non-existent negotiations and unwillingness to compromise to make a deal."

- Allegations that Chen "stopped" a $6 million sale of the building. Chen argued that he was never given a copy of the proposed sale contract; that the sale was contingent upon persuading an existing third-floor tenant, FrogDesign, to lease the fourth floor, a "difficult task"; and that Colley had

13

confided that he did not want to sell because it would reduce his "sphere of influence."

- Other issues that appear to have arisen in the aftermath of Comerica's departure from the building. Chen alludes to a refinancing proposal subject to a requirement that "the cash [be] put into a security fund until the bank's successful releasing and after their one-year escape clause had passed." Chen accused Colley of having "made it abundantly clear you would not keep the cash in reserve in case the bank left the building and recalled the loan amount in full and that you would immediately spend the cash on business or pleasure elsewhere."

- Reference is also made to loan payments owed to Comerica Bank and the difficulties in making the payments when "4 of our 6 floors have no tenants." Chen also notes that "[c]urrently, the Co-ownership has no monthly income and relies entirely on cash calls to cover its expenses." Chen urges that "[i]f you have a problem paying these cash calls, we must meet to discuss this problem as soon as possible and work together to resolve any setbacks the Church may be experiencing instead of writing venomous and disparaging correspondence."

- Chen recounted that he had proposed several possible brokers to Colley, which Colley had refused or not acted upon. "We had been waiting for your decision on this matter until November 28, 2002 when we divided the co-owned floors."

- The church's "illegal" occupation of the fourth-floor space previously occupied by BAM! (after the broker's six-month contract expired without finding a tenant) and failing to pay rentals.

- An abortive effort to subdivide the fourth floor.

- "Numerous complaints" regarding Colley's "performance as the physical plant manager." Chen accused Colley of "gross mismanagement" and "fail[ing] to do the job . . . to any degree of adequacy," noting that "the roof has been leaking for 7 years despite numerous and repeated complaints from tenants" and that "[t]he lobby ceiling has endured 7 years without a single cleaning."

- A "fiasco" related to Colley's relocation of air conditioning units within the building.

14

- Colley's depositing of revenue allegedly owed to Chen into the co-ownership account.

- Responding to Colley's "roaringly proclaiming" having expended $7,500 in legal expenses in preparing his letter, Chen contends that he had expended over $32,000 on "various legal firms" "directly related to Mr. Colley's temper tantrums." Chen complains that while Colley's letters are "totally of his own accord," Chen "is held hostage, required to respond to each and every dispatch Mr. Colley sees fit to assault us with."

Chen further denied that he was trying to "starve" the church out of its percentage interest in the building, urging that "[i]t is common knowledge that the worldwide economy took a major hit after 9/11/2001."

Chen's letter concludes that "I have no choice other than to call a meeting of the co-owners," and that "[b]ecause of the serious nature of this situation, we will have legal counsel present. I believe it would be beneficial for the Church to have legal counsel at this meeting as well." Enclosed was a notice of a meeting of the co-ownership, pursuant to the amended Co-Ownership Agreement, for June 26, 2003, for purposes including "[r]esponding to and discussing the allegations made to Mr. Sam Chen and Sam Chen, Inc. by Mr. Jim Colley," "discuss[ing] building operations and the future of the co-ownership of the building," and "[a]ny necessary amendments to the Co-Ownership Agreement." The notice indicated that the meeting would be held at Hilgers & Watkin's downtown Austin office.

Between June 2 and 17, the firm undertook research regarding the "General Partnership Act," the notice provision of the co-ownership agreement, and "remedies for dissolution of tenancy in common," "methods to sever tenancy in common," and "partition."

15

On July 3, Reetz wrote attorney John F. Campbell, who was assisting the church, conveying that Chen had been "disappointed" that the church had not sent a representative to the co-owners' meeting and requesting that Campbell "let us know why Mr. Colley has persisted in sending letters with such outlandish and unfounded accusations that have produced an intolerable situation between the Co-owners." It concluded that Chen was interested in selling the building if necessary to terminate the co-ownership, and invited proposals from the church to either purchase Chen's interest or sell the church's interest to Chen.

Later that month, Reetz wrote Campbell and referenced Chen's receipt of "the Agreement of Sale and Purchase of Hogg-Gregory Office Condominiums Units 2 and 3," and transmitted "our proposal" for the declarations, articles of incorporation, and bylaws "that can be forwarded on to the buyer."

In September, Reetz, on behalf of Chen, wrote Colley, copying the church trustees, regarding "numerous items that remain unresolved" and requesting that "you attend to these matters as soon as possible." These items included (1) the church's response to a term sheet regarding a refinancing offer on the building; (2) the church's failure to get bids from two roofing companies to fix a leak on the sixth floor as, Reetz stated, it had earlier promised[10]; (3) and "since we have not heard any response to the condominium documents nor on the proposed sale of the interest owned by the church, we will consider each one of these issues dead and no longer subject to negotiations." The letter concluded by requesting that the church

---

[10] Reetz added that Chen would proceed with a roofer it had procured "since you have been unresponsive to the needs of the building and this directly impacts the ability of Chen to receive rent on the sixth floor."

16

remove you as the Physical Building Manager contact person immediately. Someone else needs to work on building maintenance and represent the Church on building matters because you do not cooperate with Sam Chen, Inc. and do not demonstrate the courtesy and respect to the tenants that Sam Chen, Inc. needs. You have continued to be unresponsive to our needs as co-owner of the building along with being rude to the tenants, which directly impacts Sam Chen, Inc.'s ability to earn rent on its portion of the building.

The firm continued to bill time on work for Chen into September. As noted, defendants withdrew from representation after the church filed the underlying lawsuit in October. The parties represent that the church and Chen (with different counsel) ultimately resolved their dispute through arbitration in 2004.

### Prior representation

The church asserts that the defendants' prior representation of it involved the same "issues, defenses, and strategies" as its later dispute with Chen. The summary judgment evidence reflects that defendants provided legal services to the church in connection with four matters between 1996 and February 1998. It is undisputed that defendants' representation ended over five years before they began providing services to Chen in March 2003.

#### The 1996 representation

Novak averred that between July 2-12, 1996, he and other firm attorneys advised the church concerning a possible sale of the building to a third party, but this sale was never consummated. Firm time sheets reflect that, in fact, Novak and other firm attorneys billed time to the church in regard to matters including "real estate purchase" and "purchase of real estate and potential resale or lease to third party" between July 2-12, 1996. Novak added that "[a]fter July

17

1996, I, and to my knowledge no other attorney of Hilgers & Watkins, never provided any further legal services to [the church] in connection with the attempted sale of the Building."

Colley's testimony is essentially consistent with Novak's, although he maintained that Novak and the firm also advised the church concerning its purchase of the building and more generally explored with the church resale, leasing, or other "options for being able to support the expense of the building." Colley represents that certain of these discussions were between him and Jack Hightower, then affiliated with the firm. Colley claims to have had a preexisting social relationship with Hightower that persuaded him to hire the firm in 1996, and asserts that he "regularly consulted with Judge Hightower" in both professional and social settings "about legal matters relating to the Church's ownership of the Building, and other matters involving ownership, seeking investors, management, leasing, and possible sale of the Building, which conversations and legal advice did not always result in invoices submitted to the Church."[11]

The church urges that this evidence demonstrates that the defendants' 1996 representation of the church involved "the SAME issues, defenses, and strategies" as their 2003 representation of Chen. We disagree. The church emphasizes that the matters involved the same building and the general subjects of the church's ownership, management, financing, or sale of it. Such general resemblances in subject matter are not sufficient. *See Wadley*, 776 S.W.2d at 278 (general discussion of blood bank's potential AIDS-related liability during prior representation did not demonstrate substantial relationship with specific facts of subsequent AIDS-related lawsuit).

---

[11] Although ultimately not material, we note that Hightower testified that "[a]fter introducing Jim Colley to the attorneys who would perform the legal services on behalf of the Church in July 1996, I had no involvement" with the firm's subsequent representation of the church.

18

Nor is the mere fact that defendants may have represented the church in its 1996 purchase of the building and later represented Chen in negotiating the possible termination or buyout of the co-ownership (a transaction that would involve the parties' respective interests under the intervening Co-Ownership Agreement, among other distinctions). *See Drake*, 195 S.W.3d at 236-37 (lawyer's prior work representing appraisal district in property valuation cases was not substantially related to particular facts and issues in subsequent valuation case in which he represented property owner against district). The church points to no specific close relationship between the particular facts, issues, or legal theories involved in defendants' prior and subsequent representations as to "create[] a genuine threat that confidences revealed to [its] former counsel will be divulged to [its] present adversary." *Garcia*, 891 S.W.2d at 256-57; *Coker*, 765 S.W.2d at 399-400.

*1997-98 tenant disputes*

Following its purchase of the building and the abortive July 1996 third-party purchase, it is undisputed that John F. Campbell, not the firm, represented the church in its October 1996 sale of a 2/3 interest in the building to Chen and execution of the Co-Ownership Agreement. Chen was represented by Goodall & Davison. However, in February 1997, Novak assisted Colley in resolving a dispute with the Jaffe Companies, a tenant. Shortly after moving into the building, Jaffe had complained about a leaking roof, the condition of certain carpet, electrical service, construction in the building, and Comerica's signage. Jaffe asserted the right to withhold its monthly rent until its complaints were addressed. Novak prepared and transmitted two letters to Jaffe, one giving notice of default for nonpayment of rent and disputing Jaffe's position that it could withhold rent under the circumstances, and one addressing the issues Jaffe had raised. A meeting with Jaffe

19

and Colley soon followed, and Jaffe afterward paid the rent. Around this time, Novak also researched the validity of a renewal clause in the church's lease with Jaffe, determined that the provision was unenforceable, but advised the church to "wait and see" if the tenant would renew.

In July 1997, the church retained Novak to respond to complaints from another tenant, FrogDesign. FrogDesign's complaints included work crews in the building, the use of certain areas in the building for civic and social functions, and the condition of the elevators and main entrance doors. FrogDesign apparently also complained of "unsatisfactory management" or "unanswered complaints."

In February 1998, Novak represented the church in a lease dispute with Compass Bank. Billing records reflect a "problem with bank finishout." Novak explored with Colley "strategy for obtaining early move out," which Colley testified referred to an effort to persuade the Jaffe Companies to vacate early so as to enable Compass Bank to occupy the fourth floor. Subsequent billing records reflect "tenant decision not to move."

It is undisputed that this representation, completed in February 1998, was defendants' last work for the church. The work was billed and collected within the succeeding two months.

The church makes essentially two arguments in an attempt to establish a substantial relationship between defendants' work on landlord-tenant issues and their 2003 representation of Chen. First, it contends that the representations involved closely-related issues involving building "management" or "tenant issues." This argument fails for the same reason as the church's arguments regarding defendants' 1996 representation. We also note that the requisite substantial relationship cannot be predicated on the perceived risk of disclosure of facts that are common knowledge or

20

within the public domain, such as facts concerning the physical features of the building. *Syntek*, 881 S.W.2d at 321; *Wadley*, 776 S.W.2d at 278.

Second, the church argues that defendants' prior representation involved issues implicating its rights under the Co-Ownership Agreement, a primary subject of the 2003 dispute. However, as previously noted, it is undisputed that other counsel represented the church and Chen in their negotiation of the 1996 transaction and Co-Ownership Agreement. Novak further testified that the firm was never asked, and did not advise the church, regarding the church's rights under the Co-Ownership Agreement, and that the firm's work did not involve any issues regarding the relationships between the church and Chen. The church does not controvert this evidence other than to attempt to establish that defendants were representing not only the church in the 1997-98 landlord-tenant matters, but also the co-ownership. Even assuming that the summary judgment evidence presented a fact issue on that point, there is no evidence that defendants ever provided advice regarding the church's and Chen's respective rights under the Co-Ownership Agreement or the specific matters in dispute in 2003.[12]

We conclude that the district court did not err in granting summary judgment on the ground that, as a matter of law, there was no "substantial relationship" between defendants' prior and subsequent representations. Because we affirm the district court's summary judgment based on the two alternative grounds regarding the breach element of the church's claim, we need not reach the

---

[12] The basis for the church's claim, again, is defendants' alleged misuse of the church's client confidences in their subsequent representation of Chen, not that they have violated a duty of loyalty to joint clients.

21

church's complaint concerning the element of injury or damages. *See Knott*, 128 S.W.3d at 216; Tex. R. Civ. P. 166a(c).

**Discovery ruling**

Finally, we overrule the church's complaint regarding the district court's discovery ruling. The church served requests for production on defendants that sought documents from the firm's 2003 representation of Chen. Defendants objected on the basis of relevance and asserted attorney-client privilege and work product. The church moved to compel and requested an *in camera* inspection of the documents in question. The district court held that the documents were protected by the attorney-client privilege and that the church had failed to make a prima facie showing that the discovery sought was "relevant to an issue of breach of duty by a lawyer to a client" so as to be excepted from the privilege. *See* Tex. R. Evid. 503(d)(3). The court stated:

> [N]owhere is [it] alleged or shown that the previous representation by Defendant (primarily disputes between owners and their tenants) was substantially related to the present dispute (a dispute among the owners concerning ownership and management of the property). The Court notes that the present dispute between the owners does not involve any issues, defenses or strategies that were in common with the previous landlord-tenant disputes . . . nor is there any showing that the Defendant's present representation would present a possibility of misuse of confidential information. In short, there appears to be no threat that the facts of the present dispute are so related to the previous landlord tenant disputes, that a genuine threat exists that confidences revealed to former counsel will be revealed to the present adversary. As such, there is no prima facie proof or allegation of a breach of fiduciary duty by a lawyer; therefore, the exception (d)(3) does not apply.

On appeal, the church complains only that the district court abused its discretion by applying an incorrect legal standard in adjudicating its discovery issue. Specifically, the church contends that the district court conflated the requirement that the church's sought-after discovery be

22

relevant to the issue of whether defendants breached their duties, *see* Tex. R. Evid. 503(d)(3), with what it views as "the ultimate issue in the case," the existence of a substantial relationship between the two representations. We disagree. First, because the church has failed to raise a fact issue as to whether it had actually disclosed specific confidential information to defendants, any error regarding the church's discovery of information regarding defendants' representation of Chen would be harmless. *See Booth*, 895 S.W.2d at 772-73. Second, the scope of discovery relevant to breach of duty would necessarily reflect the substantive standard of proof—which, under the church's theory of the case, is that breach can be proven merely by establishing a substantial relationship between the defendants' prior and subsequent representations. We conclude that the district court did not abuse its discretion in its discovery ruling.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Henson

Affirmed

Filed: May 23, 2007

23