TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-04-00750-CV






Capital City Church of Christ, Appellant


v.


Ralph Martin Novak, Jr.; Robert E. Reetz, Jr. and Hilgers & Watkins P.C., Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT

NO. GN303974, HONORABLE PETER M. LOWRY, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N



 This is an appeal from a summary judgment granted on claims asserted by the Capital
City Church of Christ (the church), (1) against appellees Hilgers & Watkins, P.C. (the firm), and two
of its partners, Ralph Martin Novak, Jr., and Robert E. Reetz, Jr. (2) (the defendants). We affirm. The church sued the defendants for breach of fiduciary duty based on the defendants'
representation of Sam Chen, Inc. (Chen) in a 2003 dispute with the church. The church and Chen
had been co-owners of a six-story building at 804 Congress Avenue in Austin (the building) since
October 1996. Their relationship was governed by a Co-Ownership Agreement that, to summarize,
contemplated that they would rent office space in the building to third parties, made the church
responsible for the building's physical facilities, and made Chen responsible for finances and
accounting under the arrangement. Over time, the relationship between the church (particularly, the
church's contact, Jim Colley (3)) and Chen deteriorated, with Colley accusing Chen of self-dealing or
other malfeasance and Chen accusing Colley of mismanaging the building. In late 2002, the church
and Chen agreed to work toward implementing a condominium regime under which each would own
separate floors of the building. Originally, the law firm of Armbrust & Brown represented the co-owners jointly but, as negotiations deteriorated and conflicts arose, Chen hired Hilgers & Watkins
as its separate counsel. 

 Upon learning of the firm's representation of Chen, the church and Colley raised
concerns that the firm had a conflict of interest based on its prior representation of the church. (4) We
will discuss this prior representation in detail below, but to summarize, it is undisputed that the
firm's legal work for the church took place between 1996 and early 1998 and principally involved
disputes with tenants in the building. It is also undisputed that the church was represented by other
counsel when executing the 1996 Co-Ownership Agreement and a subsequent 2002 amendment. 

 The church filed the underlying lawsuit in October 2003. Defendants withdrew from
representing Chen shortly thereafter. Chen and the church ultimately resolved their dispute
through arbitration.

 The sole claim that the church asserts is that the firm, Novak, and Reetz breached
their fiduciary duties to the church as a former firm client by misusing confidential information
obtained through that relationship to further their representation of Chen. The elements of a breach-of-fiduciary-duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) a
breach by the defendant of his fiduciary duty to the plaintiff; (3) which must result in injury to the
plaintiff or benefit to the defendant. Jones v. Blume, 196 S.W.3d 440, 447 (Tex. App.--Dallas 2006,
pet. denied). In the context of an attorney-client relationship, "[a]n attorney breaches his fiduciary
duty when he benefits improperly from the attorney-client relationship by, among other things . . .
improperly using client confidences." Gibson v. Ellis, 126 S.W.3d 324, 330 (Tex. App.--Dallas
2004, no pet.) (citing Goffney v. Rabson, 56 S.W.3d 186, 193 (Tex. App.-- Houston [14th Dist.]
2001, pet. denied)); see also Aiken v. Hancock, 115 S.W.3d 26, 28 (Tex. App.--San Antonio 2003,
pet. denied) (distinguishing between breach-of-fiduciary-duty claims against lawyers and malpractice
claims). 

 The defendants do not dispute that their prior attorney-client relationship with the
church gave rise to a fiduciary relationship. See Meyer v. Cathey, 167 S.W.3d 327, 330-31
(Tex. 2005). Their focus has instead been the remaining elements, existence of a breach and injury
or damages. The defendants sought traditional and no-evidence summary judgment that, as a matter
of law, (1) there was no "substantial relationship" between the facts and issues of their former
representation of the church and their subsequent relationship of Chen; (2) no confidential
information of the church was used or disclosed in their subsequent representation of Chen; and (3)
no injury and no damages were caused by their representation of Chen. The district court granted
the motion explicitly on each ground. The first two summary judgment grounds both relate to the
breach element of the church's breach-of-fiduciary-duty claim. The church appeals from this
ruling--disputing all three summary judgment grounds--and from a discovery ruling that we
will discuss later. 

 We review the district court's summary judgment de novo. Valence Operating Co.
v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005); Provident Life & Accident Ins. Co. v. Knott, 128
S.W.3d 211, 215 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence
favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in
the nonmovant's favor. Valence Operating Co., 164 S.W.3d at 661; Knott, 128 S.W.3d at 215.
Summary judgment is proper when there are no disputed issues of material fact and the movant is
entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); Shell Oil Co. v. Khan, 138 S.W.3d
288, 291 n.4 (Tex. 2004) (citing Knott, 128 S.W.3d at 215-16). Furthermore, "[a] defendant who
conclusively negates at least one of the essential elements of the plaintiff's cause of action is entitled
to summary judgment." Little v. Texas Dep't of Crim. Justice, 148 S.W.3d 374, 381 (Tex. 2004)
(citing Randall's Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex. 1995)). (5) 


Evidence of breach

 Defendants have presented undisputed summary judgment evidence that they have
not actually used or divulged to Chen the church's confidential information. Further, while making
some vague and conclusory allusions that it discussed information regarding "purchase,"
"operation," or "leasing" of the building with defendants, the church has not identified any specific
confidential information that it conveyed to the defendants during their prior representation. To the
contrary, the summary judgment evidence reflects that the prior representation involved
communications with tenants or other third parties (6) and issues principally concerning matters known
to third parties, such as the terms of their lease agreements or the physical features of the building. (7) 
The church instead seeks to rely on a series of presumptions (or, the church suggests, at least the
rationale underlying them) that operate when a former client seeks to disqualify a former attorney
from subsequently representing an adverse party.

 A former client may seek to disqualify a former attorney from representing a
subsequent adversary based on the threat that the attorney will intentionally or inadvertently reveal
the former client's confidences during the later representation. The former client must establish a
preponderance of the facts demonstrating a "substantial relationship" between the two
representations by proving "the existence of a prior attorney-client relationship in which the factual
matters involved were so related to the facts in the pending litigation that it creates a genuine threat
that confidences revealed to his former counsel will be divulged to his present adversary." NCNB
Tex. Nat'l Bank v. Coker, 765 S.W.2d 398, 400 (Tex. 1989). Sustaining this burden requires
"evidence of specific similarities capable of being recited in the disqualification order." Id. If the
former client can meet this burden, it is conclusively presumed that the former client revealed
confidences and secrets to the attorney that would be at risk of disclosure in the current
representation. Id. "In this manner, the movant is not required to reveal the very confidences he
wishes to protect." Id. Further, by proving the substantial relationship between the two
representations, the movant also establishes as a matter of law that "an appearance of impropriety
exists." Id. As such, "[a]lthough the former attorney will not be presumed to have revealed the
confidences to his present client, the trial court should perform its role in the internal regulation of
the legal profession and disqualify counsel from further representation in the pending litigation."  Id.

 The church asserts that there is a "substantial relationship" between the defendants'
prior and subsequent representation and that the presumptions that arise in the disqualification
context should serve as a substitute for the traditional proof requirements on its breach-of-fiduciary-duty claim. To date, there is no reported Texas authority to support our applying the "substantial
relationship" analysis in this manner. In the sole reported case presenting that question, the Dallas
Court of Appeals refused to "substitute a conclusive presumption, which exists for disqualification
purposes, for real evidence" in a former client's breach-of-fiduciary-duty claim against a law firm,
and held that the presumption "cannot raise a fact issue on disclosure of confidences." City of
Garland v. Booth, 895 S.W.2d 766, 773 (Tex. App.--Dallas 1995, writ denied). Relying on proof
similar to that which defendants present here, the court affirmed summary judgment in favor of the
firm. Id. at 772-73. 

 The church counters that an unpublished opinion from the Amarillo Court of Appeals
creates "a split . . . as to whether the presumption of disclosure found in attorney disqualification
cases is applicable to actions for breach of fiduciary duty." See Reppert v. Hooks,
No. 07-97-0302-CV, 1998 Tex. App. LEXIS 5552 (Tex. App.--Amarillo Aug. 28, 1998, pet.
denied). In fact, Reppert follows similar logic as Booth in observing that while "[i]n the
disqualification mode, the applicable test is whether there is a genuine threat of disclosure, rather
than an actual disclosure," a breach-of-fiduciary-duty claim requires the plaintiff "to show an actual
disclosure to recover." 1998 Tex. App. LEXIS 5552, at *28. The Amarillo court found that the
evidence raised a fact issue regarding actual disclosure and, as the church emphasizes, its analysis
appears to give some weight to the "difficulty of showing the revelation of confidences by a former
attorney." However, the court relied upon actual evidence that the former client had conveyed
specific confidential information to the attorney in connection with the client's purchase of a note
that later was the basis for the very claims that the attorney filed against the former client. Id. at *28-29. 

 We conclude that the presumptions that arise from a "substantial relationship"
between prior and subsequent representations in the attorney disqualification context cannot
substitute for the traditional requirement that the church support its breach-of-fiduciary-duty claim
with evidence. Booth, 895 S.W.2d at 772-73. That is not the purpose or effect of the presumption.
Establishing a "substantial relationship" between the prior and subsequent representation for
disqualification purposes does not give rise to a presumption that confidences obtained in the prior
representation have actually been disclosed to the present adversary. To the contrary, "the former
attorney will not be presumed to have revealed the confidences to his present client." Coker,
765 S.W.2d at 400 (emphasis added). A "substantial relationship" instead gives rise to an
"appearance of impropriety"--a basis for disqualification, not an element of a tort claim--that
derives from the perceived risk that confidential information will be disclosed. Id. 

 We conclude, as did the Booth court, that a "substantial relationship" between prior
and subsequent representations, standing alone, "cannot raise a fact issue on disclosure of
confidences," 895 S.W.2d at 773, and that the district court properly granted summary judgment on
the ground that, as a matter of law, no confidential information of the church was used or disclosed
in the defendants' subsequent representation of Chen. 


Substantial relationship

 Alternatively, we agree with the district court that the church failed to raise a fact
issue regarding a "substantial relationship" between the defendants' prior representation of the
church and their subsequent representation of Chen. The "substantial relationship" standard requires
the former client to prove specific factual similarities, liability issues, or strategies from the prior
representation that are so closely related to those of the subsequent representation as to "create[] a
genuine threat that confidences revealed to his former counsel will be divulged to his present
adversary." Texaco, Inc. v. Garcia, 891 S.W.2d 253, 256-57 (Tex. 1995); Coker, 765 S.W.2d at
399-400; see Spears v. Fourth Court of Appeals, 797 S.W.2d 654, 656 (Tex. 1990) ("[M]ere
allegations of unethical conduct or evidence showing a remote possibility of a violation of the
disciplinary rules will not suffice."). Conclusory statements about similarities in the representations
are not sufficient; instead, the standard requires sufficiently specific delineation of subject matter,
issues, and causes of action presented to enable the trial court to engage in a "painstaking analysis
of the facts." J.K. & Susie L. Wadley Research Inst. & Blood Bank v. Morris, 776 S.W.2d 271, 278
(Tex. App.--Dallas 1989, no writ). Likewise, "[a] superficial resemblance between issues is not
enough to constitute a substantial relationship." Id.; see In re Drake, 195 S.W.3d 232, 236-37 (Tex.
App.--San Antonio 2006, no pet.) (mere fact that lawyer had long represented county tax appraisal
district in suits over valuation of property, involving similar defenses and strategies, did not establish
"substantial relationship" with subsequent valuation dispute in which counsel represented property
owner). Nor does an attorney's mere generalized knowledge of a client's "inner workings" in regard
to selecting experts or fact witnesses, "preparing and responding to discovery requests, formulating
defense strategies, trial preparation, and attending settlement conferences" constitute the required
"specific factual similarities" between prior and subsequent representations. In re Drake, 195
S.W.3d at 236-37. Further, a "substantial relationship" cannot be predicated upon the perceived risk
of disclosure of facts that are common knowledge, within the public domain, or that have already
been provided to the present adversary. Metropolitan Life Ins. Co. v. Syntek Fin. Corp., 881 S.W.2d
319, 321 (Tex. 1994); Wadley, 776 S.W.2d at 278. 

 We begin by comparing the summary judgment evidence regarding defendants' prior
representation of the church and their subsequent representation of Chen.


 The church vs. Chen dispute 

 In 1996, the church purchased the building. In October of that year, the church sold
a 2/3 undivided interest in the building to Chen, retaining an undivided 1/3 share. Also in 1996, the
two entities executed a Co-Ownership Agreement for the purposes of jointly maintaining, renting,
or selling the building as a commercial office building and sharing in revenue and expenses. 
Attorney John F. Campbell represented the church in these transactions, while Anthony Goodall of
Goodall & Davison represented Chen.

 In its original form, the Co-Ownership Agreement specified that the church and Chen
each would have the right to occupy or sublease certain assigned floors of the building, (8) with no
obligation to pay those rents and charges to the co-ownership, and to jointly lease the remaining
floors. The agreement further provided that the church would manage all physical assets of the Co-Ownership and be responsible for repairs and maintenance of all assets, while Chen would manage
all financial matters and be responsible for collecting and accounting for revenues and payment of
expenses and debt service. 

 By August 2002, disputes had begun to arise between the church and Chen. There
is evidence suggesting that these conflicts were attributable to some extent to financial strains on the
co-ownership caused by a loss of tenants and difficult market conditions. On or about August 2002,
Comerica Bank, a major tenant of the building, gave notice of its intent to terminate its lease later
that year. Correspondence reflects that counsel Bob Burton of Armbrust & Brown had negotiated
a lease agreement between the church and Comerica in 1996 for tenancy of the first and third floors
of the building, and that, in 2001, Comerica had negotiated a renewal of its lease and a right to
terminate upon six-months' notice. The church proposed to Chen that the co-ownership again retain
Burton "to handle matters regarding the Comerica lease," as he "has represented the Co-ownership's
interests regarding this particular tenant over the past six years." Chen instead engaged
Goodall--the attorney who had represented Chen in purchasing its interest and negotiating the Co-Ownership Agreement--to "draft a letter . . . advising the bank of its obligations regarding the
termination of the lease," including payment of "escalation rents (pass through expenses)." Colley
insisted that Burton should serve as the co-ownership's counsel in connection with the matter,
expressing concern that "the Church and Sam Chen may have conflicting interests with respect to
Comerica Bank's tenancy and/or lease termination." Chen also began the process of hiring a broker,
presumably to assist in re-leasing the Comerica space. Subsequently, Burton, representing the co-owners, communicated to Comerica a willingness to "explore any and all options which would
enable [Comerica] to remain in the Building." The record reflects that Comerica vacated the
building in November 2002, although it paid rent through mid-December.

 Also in November, the church and Chen executed a First Amendment to their Co-Ownership Agreement. Among other changes, the parties expanded their respective rights of
occupancy (and corresponding exclusive rights to rent revenues), dividing all remaining floors of the
building between them. (9) They also agreed to negotiate in good faith to replace, within six months, 
their tenancy-in-common with a condominium regime under which each would independently own
their respective floors. Burton began work on the necessary instruments and, in February 2003,
transmitted to each co-owner a binder of proposed documents for the "Hogg-Gregory Office
Condominiums." Burton noted that "the co-owners will need to reach agreement on the common
interest allocation for each unit," which "specify the percentage interest in the general common
elements attributable to each unit and determine the percentage of the annual budget of the
Association paid by each unit owner." Burton also requested that the co-owners review the proposed
declarations, articles, and bylaws "with respect to the number of directors and the percentage vote
required for certain actions by the Association." 

 On March 28, 2003, Chen wrote Burton advising that "[a]fter reviewing your
proposed condominium documents for the Hogg-Gregory Office Condominiums, Sam Chen, Inc.
. . . must completely oppose your proposal." Chen accused Burton of "grossly neglect[ing] Chen's
interest" and that "[i]n order to safeguard the assets of Chen, I must terminate your legal services to
Chen." On March 31, Burton wrote Colley and Chen requesting a conflict waiver to enable him to
continue representing the church. On the same day, Chen met with Reetz, and Hilgers & Watkins
began to provide legal services to Chen.

 In the months that followed, Reetz, Novak, and other firm attorneys billed time to
Chen related to the condominium conversion, including research concerning "condominium statutes"
and rules, zoning issues, and the property tax status of nonprofit or tax-exempt organizations. On
June 2, billing records reflect that Reetz began working on a letter "in response to Colley letter." 
Colley's letter is not in the summary judgment record, but the record does include a June 17 letter
from Sam Chen to Colley responding to "your letter dated June 2, 2003." Chen appears to take great
offense to whatever Colley's letter said, alluding to "twelve pages and twenty-five exhibits" of
"machinations and delusional lies," urging Colley to "consult a psychiatric counselor," and accusing
him of "childish behavior" and "language inappropriate coming from a minister." Other comments
in Chen's letter suggest that Colley's letter may have been prompted by financial demands that Chen
had made on the church to fund the co-ownership amid dwindling revenues. 

 Much of Chen's letter concerns Colley's apparent personal attacks of Chen, but
several issues are raised concerning various aspects of Property management and the parties' rights
under the Co-Ownership Agreement: 



 A dispute over Colley's "questionable" use of petty cash to purchase items
for uses that Chen viewed as unrelated to running an office building or that
were unnecessary in light of building occupancy or existing janitorial service
contracts.


 


 Disputes over the parties' respective efforts to locate tenants for the building. 
Chen argued that the building had over 80% occupancy between 1999-2002
and that, after a tenant, BAM!, had vacated fourth-floor space, Chen had
immediately hired a broker on a six-month contract to find a tenant. Chen
attributed the loss of Compass Bank to Colley's "harsh to non-existent
negotiations and unwillingness to compromise to make a deal." 


 


 Allegations that Chen "stopped" a $6 million sale of the building. Chen
argued that he was never given a copy of the proposed sale contract; that the
sale was contingent upon persuading an existing third-floor tenant,
FrogDesign, to lease the fourth floor, a "difficult task"; and that Colley had
confided that he did not want to sell because it would reduce his "sphere of
influence."


 


 Other issues that appear to have arisen in the aftermath of Comerica's
departure from the building. Chen alludes to a refinancing proposal subject
to a requirement that "the cash [be] put into a security fund until the bank's
successful releasing and after their one-year escape clause had passed." Chen
accused Colley of having "made it abundantly clear you would not keep the
cash in reserve in case the bank left the building and recalled the loan amount
in full and that you would immediately spend the cash on business or pleasure
elsewhere." 


 

 

 Reference is also made to loan payments owed to Comerica Bank and the
difficulties in making the payments when "4 of our 6 floors have no tenants."
Chen also notes that "[c]urrently, the Co-ownership has no monthly income
and relies entirely on cash calls to cover its expenses." Chen urges that "[i]f
you have a problem paying these cash calls, we must meet to discuss this
problem as soon as possible and work together to resolve any setbacks the
Church may be experiencing instead of writing venomous and disparaging
correspondence." 


 


 Chen recounted that he had proposed several possible brokers to Colley,
which Colley had refused or not acted upon. "We had been waiting for your
decision on this matter until November 28, 2002 when we divided the co-owned floors."


 


 The church's "illegal" occupation of the fourth-floor space previously
occupied by BAM! (after the broker's six-month contract expired without
finding a tenant) and failing to pay rentals.


 


 An abortive effort to subdivide the fourth floor.


 


 "Numerous complaints" regarding Colley's "performance as the physical
plant manager." Chen accused Colley of "gross mismanagement" and
"fail[ing] to do the job . . . to any degree of adequacy," noting that "the roof
has been leaking for 7 years despite numerous and repeated complaints from
tenants" and that "[t]he lobby ceiling has endured 7 years without a single
cleaning."


 


 A "fiasco" related to Colley's relocation of air conditioning units within the
building.


 


 Colley's depositing of revenue allegedly owed to Chen into the co-ownership
account.


 


 Responding to Colley's "roaringly proclaiming" having expended $7,500 in
legal expenses in preparing his letter, Chen contends that he had expended
over $32,000 on "various legal firms" "directly related to Mr. Colley's
temper tantrums." Chen complains that while Colley's letters are "totally of
his own accord," Chen "is held hostage, required to respond to each and
every dispatch Mr. Colley sees fit to assault us with." 




Chen further denied that he was trying to "starve" the church out of its percentage interest in the
building, urging that "[i]t is common knowledge that the worldwide economy took a major
hit after 9/11/2001." 

 Chen's letter concludes that "I have no choice other than to call a meeting of the co-owners," and that "[b]ecause of the serious nature of this situation, we will have legal counsel
present. I believe it would be beneficial for the Church to have legal counsel at this meeting as
well." Enclosed was a notice of a meeting of the co-ownership, pursuant to the amended Co-Ownership Agreement, for June 26, 2003, for purposes including "[r]esponding to and discussing
the allegations made to Mr. Sam Chen and Sam Chen, Inc. by Mr. Jim Colley," "discuss[ing]
building operations and the future of the co-ownership of the building," and "[a]ny necessary
amendments to the Co-Ownership Agreement." The notice indicated that the meeting would be held
at Hilgers & Watkin's downtown Austin office. 

 Between June 2 and 17, the firm undertook research regarding the "General
Partnership Act," the notice provision of the co-ownership agreement, and "remedies for dissolution
of tenancy in common," "methods to sever tenancy in common," and "partition." 

 On July 3, Reetz wrote attorney John F. Campbell, who was assisting the church,
conveying that Chen had been "disappointed" that the church had not sent a representative to the co-owners' meeting and requesting that Campbell "let us know why Mr. Colley has persisted in sending
letters with such outlandish and unfounded accusations that have produced an intolerable situation
between the Co-owners." It concluded that Chen was interested in selling the building if necessary
to terminate the co-ownership, and invited proposals from the church to either purchase Chen's
interest or sell the church's interest to Chen. 

 Later that month, Reetz wrote Campbell and referenced Chen's receipt of "the
Agreement of Sale and Purchase of Hogg-Gregory Office Condominiums Units 2 and 3," and
transmitted "our proposal" for the declarations, articles of incorporation, and bylaws "that can be
forwarded on to the buyer." 

 In September, Reetz, on behalf of Chen, wrote Colley, copying the church trustees,
regarding "numerous items that remain unresolved" and requesting that "you attend to these matters
as soon as possible." These items included (1) the church's response to a term sheet regarding a
refinancing offer on the building; (2) the church's failure to get bids from two roofing companies to
fix a leak on the sixth floor as, Reetz stated, it had earlier promised (10); (3) and "since we have not
heard any response to the condominium documents nor on the proposed sale of the interest owned
by the church, we will consider each one of these issues dead and no longer subject to negotiations." 
The letter concluded by requesting that the church 


remove you as the Physical Building Manager contact person immediately. Someone
else needs to work on building maintenance and represent the Church on building
matters because you do not cooperate with Sam Chen, Inc. and do not demonstrate
the courtesy and respect to the tenants that Sam Chen, Inc. needs. You have
continued to be unresponsive to our needs as co-owner of the building along with
being rude to the tenants, which directly impacts Sam Chen, Inc.'s ability to earn rent
on its portion of the building. 



 The firm continued to bill time on work for Chen into September. As noted,
defendants withdrew from representation after the church filed the underlying lawsuit in October. 
The parties represent that the church and Chen (with different counsel) ultimately resolved their
dispute through arbitration in 2004.

 

 Prior representation

 The church asserts that the defendants' prior representation of it involved the same
"issues, defenses, and strategies" as its later dispute with Chen. The summary judgment evidence
reflects that defendants provided legal services to the church in connection with four matters between
1996 and February 1998. It is undisputed that defendants' representation ended over five years
before they began providing services to Chen in March 2003. 


 The 1996 representation

 Novak averred that between July 2-12, 1996, he and other firm attorneys advised the
church concerning a possible sale of the building to a third party, but this sale was never
consummated. Firm time sheets reflect that, in fact, Novak and other firm attorneys billed time to
the church in regard to matters including "real estate purchase" and "purchase of real estate and
potential resale or lease to third party" between July 2-12, 1996. Novak added that "[a]fter July
1996, I, and to my knowledge no other attorney of Hilgers & Watkins, never provided any further
legal services to [the church] in connection with the attempted sale of the Building." 

 Colley's testimony is essentially consistent with Novak's, although he maintained that
Novak and the firm also advised the church concerning its purchase of the building and more
generally explored with the church resale, leasing, or other "options for being able to support the
expense of the building." Colley represents that certain of these discussions were between him and
Jack Hightower, then affiliated with the firm. Colley claims to have had a preexisting social
relationship with Hightower that persuaded him to hire the firm in 1996, and asserts that he
"regularly consulted with Judge Hightower" in both professional and social settings "about legal
matters relating to the Church's ownership of the Building, and other matters involving ownership,
seeking investors, management, leasing, and possible sale of the Building, which conversations and
legal advice did not always result in invoices submitted to the Church." (11) 

 The church urges that this evidence demonstrates that the defendants' 1996
representation of the church involved "the SAME issues, defenses, and strategies" as their 2003
representation of Chen. We disagree. The church emphasizes that the matters involved the same
building and the general subjects of the church's ownership, management, financing, or sale of it. 
Such general resemblances in subject matter are not sufficient. See Wadley, 776 S.W.2d at 278
(general discussion of blood bank's potential AIDS-related liability during prior representation did
not demonstrate substantial relationship with specific facts of subsequent AIDS-related lawsuit). 
Nor is the mere fact that defendants may have represented the church in its 1996 purchase of the
building and later represented Chen in negotiating the possible termination or buyout of the co-ownership (a transaction that would involve the parties' respective interests under the intervening
Co-Ownership Agreement, among other distinctions). See Drake, 195 S.W.3d at 236-37 (lawyer's
prior work representing appraisal district in property valuation cases was not substantially related
to particular facts and issues in subsequent valuation case in which he represented property owner
against district). The church points to no specific close relationship between the particular facts,
issues, or legal theories involved in defendants' prior and subsequent representations as to "create[]
a genuine threat that confidences revealed to [its] former counsel will be divulged to [its] present
adversary." Garcia, 891 S.W.2d at 256-57; Coker, 765 S.W.2d at 399-400. 

 

 1997-98 tenant disputes

 Following its purchase of the building and the abortive July 1996 third-party
purchase, it is undisputed that John F. Campbell, not the firm, represented the church in its October
1996 sale of a 2/3 interest in the building to Chen and execution of the Co-Ownership Agreement. 
Chen was represented by Goodall & Davison. However, in February 1997, Novak assisted Colley
in resolving a dispute with the Jaffe Companies, a tenant. Shortly after moving into the building,
Jaffe had complained about a leaking roof, the condition of certain carpet, electrical service,
construction in the building, and Comerica's signage. Jaffe asserted the right to withhold its monthly
rent until its complaints were addressed. Novak prepared and transmitted two letters to Jaffe, one
giving notice of default for nonpayment of rent and disputing Jaffe's position that it could withhold
rent under the circumstances, and one addressing the issues Jaffe had raised. A meeting with Jaffe
and Colley soon followed, and Jaffe afterward paid the rent. Around this time, Novak also
researched the validity of a renewal clause in the church's lease with Jaffe, determined that the
provision was unenforceable, but advised the church to "wait and see" if the tenant would renew.

 In July 1997, the church retained Novak to respond to complaints from another tenant,
FrogDesign. FrogDesign's complaints included work crews in the building, the use of certain areas
in the building for civic and social functions, and the condition of the elevators and main entrance
doors. FrogDesign apparently also complained of "unsatisfactory management" or
"unanswered complaints." 

 In February 1998, Novak represented the church in a lease dispute with Compass
Bank. Billing records reflect a "problem with bank finishout." Novak explored with Colley
"strategy for obtaining early move out," which Colley testified referred to an effort to persuade the
Jaffe Companies to vacate early so as to enable Compass Bank to occupy the fourth floor. 
Subsequent billing records reflect "tenant decision not to move." 

 It is undisputed that this representation, completed in February 1998, was defendants'
last work for the church. The work was billed and collected within the succeeding two months. 

 The church makes essentially two arguments in an attempt to establish a substantial
relationship between defendants' work on landlord-tenant issues and their 2003 representation of
Chen. First, it contends that the representations involved closely-related issues involving building
"management" or "tenant issues." This argument fails for the same reason as the church's arguments
regarding defendants' 1996 representation. We also note that the requisite substantial relationship
cannot be predicated on the perceived risk of disclosure of facts that are common knowledge or
within the public domain, such as facts concerning the physical features of the building. Syntek,
881 S.W.2d at 321; Wadley, 776 S.W.2d at 278. 

 Second, the church argues that defendants' prior representation involved issues
implicating its rights under the Co-Ownership Agreement, a primary subject of the 2003 dispute. 
However, as previously noted, it is undisputed that other counsel represented the church and Chen
in their negotiation of the 1996 transaction and Co-Ownership Agreement. Novak further testified
that the firm was never asked, and did not advise the church, regarding the church's rights under the
Co-Ownership Agreement, and that the firm's work did not involve any issues regarding the
relationships between the church and Chen. The church does not controvert this evidence other than
to attempt to establish that defendants were representing not only the church in the 1997-98 landlord-tenant matters, but also the co-ownership. Even assuming that the summary judgment evidence
presented a fact issue on that point, there is no evidence that defendants ever provided advice
regarding the church's and Chen's respective rights under the Co-Ownership Agreement or the
specific matters in dispute in 2003. (12) 

 We conclude that the district court did not err in granting summary judgment on the
ground that, as a matter of law, there was no "substantial relationship" between defendants' prior and
subsequent representations. Because we affirm the district court's summary judgment based on the
two alternative grounds regarding the breach element of the church's claim, we need not reach the
church's complaint concerning the element of injury or damages. See Knott, 128 S.W.3d at 216;
Tex. R. Civ. P. 166a(c). 


Discovery ruling 

 Finally, we overrule the church's complaint regarding the district court's discovery
ruling. The church served requests for production on defendants that sought documents from the
firm's 2003 representation of Chen. Defendants objected on the basis of relevance and asserted
attorney-client privilege and work product. The church moved to compel and requested an in
camera inspection of the documents in question. The district court held that the documents were
protected by the attorney-client privilege and that the church had failed to make a prima facie
showing that the discovery sought was "relevant to an issue of breach of duty by a lawyer to a client"
so as to be excepted from the privilege. See Tex. R. Evid. 503(d)(3). The court stated:


[N]owhere is [it] alleged or shown that the previous representation by Defendant
(primarily disputes between owners and their tenants) was substantially related to the
present dispute (a dispute among the owners concerning ownership and management
of the property). The Court notes that the present dispute between the owners does
not involve any issues, defenses or strategies that were in common with the previous
landlord-tenant disputes . . . nor is there any showing that the Defendant's present
representation would present a possibility of misuse of confidential information. In
short, there appears to be no threat that the facts of the present dispute are so related
to the previous landlord tenant disputes, that a genuine threat exists that confidences
revealed to former counsel will be revealed to the present adversary. As such, there
is no prima facie proof or allegation of a breach of fiduciary duty by a lawyer;
therefore, the exception (d)(3) does not apply. 



 On appeal, the church complains only that the district court abused its discretion by
applying an incorrect legal standard in adjudicating its discovery issue. Specifically, the church
contends that the district court conflated the requirement that the church's sought-after discovery be
relevant to the issue of whether defendants breached their duties, see Tex. R. Evid. 503(d)(3), with
what it views as "the ultimate issue in the case," the existence of a substantial relationship between
the two representations. We disagree. First, because the church has failed to raise a fact issue as to
whether it had actually disclosed specific confidential information to defendants, any error regarding
the church's discovery of information regarding defendants' representation of Chen would be
harmless. See Booth, 895 S.W.2d at 772-73. Second, the scope of discovery relevant to breach of
duty would necessarily reflect the substantive standard of proof--which, under the church's theory
of the case, is that breach can be proven merely by establishing a substantial relationship between
the defendants' prior and subsequent representations. We conclude that the district court did not
abuse its discretion in its discovery ruling.


CONCLUSION

 We affirm the judgment of the district court. 


 ____________________________________

 Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Henson

Affirmed

Filed: May 23, 2007
1. In the record, appellant is also termed the "Church of Christ, Capital City Congregation,
Inc." or "CCCCC." However, appellant's briefing uses "Capital City Church of Christ," and we will
do the same. 
2. The firm has since merged with Brown McCarroll, L.L.P., and Reetz and Novak are both
partners in that entity. 
3. Colley identified himself as the church's "Pulpit Minister." 
4. In response to this concern, Reetz sent Colley a letter in which he explained that the firm's
"representation was over six years ago and involved lease issues with tenants of the building." Reetz
further explained:


Our code of ethics requires us to either withdraw or obtain a waiver if there is a
conflict of interest wherein the matter is "substantially related" to the prior
representation of the adverse party. I have provided copies of the work that Hilgers
& Watkins did on behalf of Capital City Congregational Church of Christ in 1997 to
Tom Watkins, our senior partner who reviews all ethics questions on behalf of the
firm. It is his opinion that the nature of the prior representation does not meet the
threshold test of "substantially related" matter. . . . Therefore, we maintain that we
may continue representing Sam Chen, Inc. with regards to the co-ownership
agreement.
5. The church objects to our consideration of an exhibit the firm filed with its appellate brief
that purports to demonstrate a timeline of relevant events in this case. We have relied only on the
evidence in the record. 
6. Novak, who represented the church in the prior matters, testified that he knew of no
information given to him by the church in the course of that representation that the church asked him
not to share with the third parties involved. 
7. E.g., leaks in the roof, elevator carpeting. 
8. The church had the right to occupy or sublet the second floor of the six-story building, and
Chen the fifth and sixth floors. 
9. In addition to its pre-existing rights to the fifth and sixth floors, Chen was given rights to
the first and fourth floors. The church, which previously had rights to the second floor, also received
rights to the third floor. 
10. Reetz added that Chen would proceed with a roofer it had procured "since you have been
unresponsive to the needs of the building and this directly impacts the ability of Chen to receive rent
on the sixth floor."
11. Although ultimately not material, we note that Hightower testified that "[a]fter introducing
Jim Colley to the attorneys who would perform the legal services on behalf of the Church in July
1996, I had no involvement" with the firm's subsequent representation of the church. 
12. The basis for the church's claim, again, is defendants' alleged misuse of the church's client
confidences in their subsequent representation of Chen, not that they have violated a duty of loyalty
to joint clients.